# UNITED STATES *v.* INADI

No. 84–1580.   Argued December 3, 1985—Decided March 10, 1986

388

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 400.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Trott, Samuel A. Alito, Jr.,* and *Patty Merkamp Stemler.*

*Holly Maguigan* argued the cause for respondent. With her on the brief were *Julie Shapiro* and *William F. Sheehan.*

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the Confrontation Clause requires the Government to show that a nontestifying co-conspirator is unavailable to testify, as a condition for admission of that co-conspirator's out-of-court statements.

## I

Following a jury trial in the Eastern District of Pennsylvania, respondent Joseph Inadi was convicted of conspiring to

manufacture and distribute methamphetamine, and related offenses. He was sentenced to three years' imprisonment to be followed by a 7-year parole term. The evidence at trial showed that in September 1979, respondent was approached by unindicted co-conspirator Michael McKeon, who was seeking a distribution outlet for methamphetamine. Respondent's role was to supply cash and chemicals for the manufacture of methamphetamine and to be responsible for its distribution. McKeon and another unindicted co-conspirator, William Levan, were to manufacture the substance.

In the course of manufacturing and selling methamphetamine, McKeon, Levan, and respondent met with another unindicted co-conspirator, John Lazaro, at an empty house in Cape May, New Jersey. There they extracted additional methamphetamine from the liquid residue of previous batches. In the early morning hours of May 23, 1980, two Cape May police officers, pursuant to a warrant, secretly entered the house and removed a tray covered with drying methamphetamine. With the permission of the issuing Magistrate, the officers delayed returning an inventory, leaving the participants to speculate over what had happened to the missing tray.

On May 25, 1980, two Drug Enforcement Administration agents in Philadelphia monitored a meeting between respondent and Lazaro alongside Lazaro's car. At one point one of the agents saw respondent lean into the car. After Lazaro drove off, the agents stopped his car. They searched the car, Lazaro, and a passenger, Marianne Lazaro, but they found nothing and let the Lazaros leave. Marianne Lazaro later recounted that during the search she threw away a clear plastic bag containing white powder that her husband had handed to her after the meeting with respondent. Eight hours after the search, one of the agents returned to the scene of the crime and found a clear plastic bag containing a small quantity of methamphetamine.

From May 23 to May 27, 1980, the Cape May County Prosecutor's Office lawfully intercepted and recorded five telephone conversations between various participants in the conspiracy. These taped conversations were played for the jury at trial. The conversations dealt with various aspects of the conspiracy, including planned meetings and speculation about who had taken the missing tray from the house and who had set Lazaro up for the May 25 stop and search. Respondent sought to exclude the recorded statements of Lazaro and the other unindicted co-conspirators on the ground that the statements did not satisfy the requirements of Federal Rule of Evidence 801(d)(2)(E), governing admission of co-conspirator declarations.[1] After listening to the tapes the trial court admitted the statements, finding that they were made by conspirators during the course of and in furtherance of the conspiracy, and thereby satisfied Rule 801(d)(2)(E).

Respondent also objected to admission of the statements on Confrontation Clause grounds, contending that the statements were inadmissible absent a showing that the declarants were unavailable. The court suggested that the prosecutor bring Lazaro to court in order to demonstrate unavailability. The court also asked defense counsel whether she wanted the prosecution to call Lazaro as a witness, and defense counsel stated that she would discuss the matter with her client. The co-conspirators' statements were admitted, conditioned on the prosecution's commitment to produce Lazaro. The Government subpoenaed Lazaro, but he failed to appear, claiming car trouble. The record does not indicate that the defense made any effort on its own part to secure Lazaro's presence in court.

Respondent renewed his Confrontation Clause objections, arguing that the Government had not met its burden of show-

---

[1] Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

ing that Lazaro was unavailable to testify. The trial court overruled the objection, ruling that Lazaro's statements were admissible because they satisfied the co-conspirator rule.[2]

The Court of Appeals for the Third Circuit reversed. 748 F. 2d 812 (1984). The court agreed that the Government had satisfied Rule 801(d)(2)(E), but decided that the Confrontation Clause established an independent requirement that the Government, as a condition to admission of any out-of-court statements, must show the unavailability of the declarant. 748 F. 2d, at 818. The court derived this "unavailability rule" from *Ohio* v. *Roberts*, 448 U. S. 56 (1980). The Court of Appeals rejected the Government's contention that *Roberts* did not require a showing of unavailability as to a nontestifying co-conspirator, finding that *Roberts* created a "clear constitutional rule" applicable to out-of-court statements generally. 748 F. 2d, at 818. The court found no reason to create a special exception for co-conspirator statements, and therefore ruled Lazaro's statements inadmissible. *Id.*, at 818–819.

We granted certiorari, 471 U. S. 1124 (1985), to resolve the question whether the Confrontation Clause requires a showing of unavailability as a condition to admission of the out-of-court statements of a nontestifying co-conspirator, when those statements otherwise satisfy the requirements of Federal Rule of Evidence 801(d)(2)(E).[3] We now reverse.

---

[2] The trial court also noted that two of the four co-conspirator declarants (Mrs. Lazaro and McKeon) had testified and that a third (Levan) was unavailable because he had asserted his Fifth Amendment privilege outside the presence of the jury.

[3] The reliability of the out-of-court statements is not at issue in this case. The Court of Appeals determined that whether or not the statements are reliable, their admission violated the Sixth Amendment because the Government did not show that the declarant was unavailable to testify. 748 F. 2d, at 818–819. The sole issue before the Court is whether that decision is correct.

## II

### A

The Court of Appeals derived its rule that the Government must demonstrate unavailability from our decision in *Roberts*. It quoted *Roberts* as holding that "in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." 448 U. S., at 65. The Court of Appeals viewed this language as setting forth a "clear constitutional rule" applicable before any hearsay can be admitted. 748 F. 2d, at 818. Under this interpretation of *Roberts*, no out-of-court statement would be admissible without a showing of unavailability.

*Roberts*, however, does not stand for such a wholesale revision of the law of evidence, nor does it support such a broad interpretation of the Confrontation Clause. *Roberts* itself disclaimed any intention of proposing a general answer to the many difficult questions arising out of the relationship between the Confrontation Clause and hearsay. "The Court has not sought to 'map out a theory of the Confrontation Clause that would determine the validity of all . . . hearsay "exceptions." ' " 448 U. S., at 64–65, quoting *California* v. *Green*, 399 U. S. 149, 162 (1970). The Court in *Roberts* remained "[c]onvinced that 'no rule will perfectly resolve all possible problems' " and rejected the "invitation to overrule a near-century of jurisprudence" in order to create such a rule. 448 U. S., at 68, n. 9, quoting Natali, *Green, Dutton*, and *Chambers:* Three Cases in Search of a Theory, 7 Rutgers-Camden L. J. 43, 73 (1975). In addition, the Court specifically noted that a "demonstration of unavailability . . . is not always required." 448 U. S., at 65, n. 7. In light of these limiting statements, *Roberts* should not be read as an abstract answer to questions not presented in that case, but

rather as a resolution of the issue the Court said it was examining: "the constitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial." *Id.*, at 58.[4]

The Confrontation Clause analysis in *Roberts* focuses on those factors that come into play when the prosecution seeks to admit testimony from a prior judicial proceeding in place of live testimony at trial. See Fed. Rule Evid. 804(b)(1). In particular, the *Roberts* Court examined the requirement, found in a long line of Confrontation Clause cases involving prior testimony, that before such statements can be admitted the government must demonstrate that the declarant is unavailable. See *Mancusi* v. *Stubbs*, 408 U. S. 204 (1972); *California* v. *Green, supra; Barber* v. *Page*, 390 U. S. 719 (1968); *Berger* v. *California*, 393 U. S. 314 (1968).[5] All of the cases cited in *Roberts* for this "unavailability rule" concern prior testimony. In particular, the Court focused on two cases, *Barber* and *Mancusi*, that directly "explored the issue of constitutional unavailability." 448 U. S., at 76. Both cases specifically limited the unavailability requirement to

---

[4] *Roberts* involved a state criminal trial on charges of forging a check in the name of Bernard Isaacs and of possession of stolen credit cards belonging to Isaacs and his wife. At the preliminary hearing, defense counsel called the Isaacs' daughter as a witness. She testified that she had permitted the defendant to use the Isaacs' apartment for several days, but she refused to admit that she had given the defendant the checks or credit cards. Between the preliminary hearing and the trial, through no fault of the State, she disappeared. At trial, the defendant testified that the Isaacs' daughter had given him the checks and credit cards to use. The State sought to offer the transcript of her preliminary hearing testimony in rebuttal. 448 U. S., at 58–60.

[5] Federal Rule of Evidence 804 also imposes an unavailability requirement before allowing the admission of prior testimony. The Rule 804 requirement is part of the law of evidence regarding hearsay. While it "may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California* v. *Green*, 399 U. S., at 155, the overlap is not complete.

prior testimony. *Barber, supra,* at 722; *Mancusi, supra,* at 211.

*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts. All of these indicate that *Roberts* simply reaffirmed a longstanding rule, foreshadowed in *Pointer* v. *Texas,* 380 U. S. 400 (1965), established in *Barber,* and refined in a line of cases up through *Roberts,* that applies unavailability analysis to prior testimony.[6] *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

## B

There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements. Unlike some other exceptions to the hearsay rules, or the exemption from the hearsay definition involved in this case, former testimony often is only a weaker substitute for live testimony. It seldom has independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence. See Graham, The Right of Confrontation and the Hearsay Rule: Sir Walter Raleigh Loses Another One, 8 Crim. L. Bull. 99, 143 (1972). But if the declarant is unavailable, no "better" version of the evidence exists, and

---

[6] In federal court the unavailability rule for former trial testimony was established long before *Pointer* v. *Texas,* 380 U. S. 400 (1965), in *Mattox* v. *United States,* 156 U. S. 237 (1895).

the former testimony may be admitted as a substitute for live testimony on the same point.

Those same principles do not apply to co-conspirator statements. Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. When the Government—as here—offers the statement of one drug dealer to another in furtherance of an illegal conspiracy, the statement often will derive its significance from the circumstances in which it was made. Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand. Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy.

In addition, the relative positions of the parties will have changed substantially between the time of the statements and the trial. The declarant and the defendant will have changed from partners in an illegal conspiracy to suspects or defendants in a criminal trial, each with information potentially damaging to the other. The declarant himself may be facing indictment or trial, in which case he has little incentive to aid the prosecution, and yet will be equally wary of coming to the aid of his former partners in crime. In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force.

These points distinguish co-conspirators' statements from the statements involved in *Roberts* and our other prior testimony cases. Those cases rested in part on the strong similarities between the prior judicial proceedings and the trial. No such strong similarities exist between co-conspirator statements and live testimony at trial. To the contrary, co-conspirator statements derive much of their value from the

fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence. Under these circumstances, "only clear folly would dictate an across-the-board policy of doing without" such statements. Advisory Committee's Introductory Note on the Hearsay Problem, quoted in Westen, The Future of Confrontation, 77 Mich. L. Rev. 1185, 1193, n. 35 (1979). The admission of co-conspirators' declarations into evidence thus actually furthers the "Confrontation Clause's very mission" which is to "advance 'the accuracy of the truth-determining process in criminal trials.'" *Tennessee* v. *Street*, 471 U. S. 409, 415 (1985), quoting *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970).

## C

There appears to be little, if any, benefit to be accomplished by the Court of Appeals' unavailability rule. First, if the declarant either is unavailable, or is available and produced by the prosecution, the statements can be introduced anyway. Thus, the unavailability rule cannot be defended as a constitutional "better evidence" rule, because it does not actually serve to exclude anything, unless the prosecution makes the mistake of not producing an otherwise available witness. Cf. Westen, *supra;* Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv. L. Rev. 1378, 1403 (1972). In this case, for example, out-of-court statements by Michael McKeon and Marianne Lazaro, who testified under immunity, could be introduced based on their testimony in court. The statements of William Levan were admissible because he properly asserted his Fifth Amendment privilege and thereby was unavailable.

Second, an unavailability rule is not likely to produce much testimony that adds anything to the "truth-determining process" over and above what would be produced without such a rule. *Dutton, supra,* at 89. Some of the available declarants already will have been subpoenaed by the prosecution or

the defense, regardless of any Confrontation Clause requirements. Presumably only those declarants that neither side believes will be particularly helpful will not have been subpoenaed as witnesses. There is much to indicate that Lazaro was in that position in this case. Neither the Government nor the defense originally subpoenaed Lazaro as a witness.[7] When he subsequently failed to show, alleging car trouble, respondent did nothing to secure his testimony. If respondent independently wanted to secure Lazaro's testimony, he had several options available, particularly under Federal Rule of Evidence 806,[8] which provides that if the party against whom a co-conspirator statement has been admitted calls the declarant as a witness, "the party is entitled to examine him on the statement as if under cross-examination." Rule 806 would not require respondent to make the showing necessary to have Lazaro declared a hostile witness, although presumably that option also was available to him. The Compulsory Process Clause would have aided respondent in obtaining the testimony of any of these declarants.[9] If the

---

[7] In fact, the actions of the parties in this case demonstrate what is no doubt a frequent occurrence in conspiracy cases—neither side wants a co-conspirator as a witness. As explained *supra*, at 395, the interests of the prosecution and the co-conspirator seldom will run together. Nor do the co-conspirator's interests coincide with his former partners, since each is in a position that is potentially harmful to the others.

[8] Rule 806 states:

"When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. . . . If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination."

[9] U. S. Const., Amdt. 6: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." Cf. Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv. L. Rev. 567, 586–601 (1978).

Government has no desire to call a co-conspirator declarant as a witness, and if the defense has not chosen to subpoena such a declarant, either as a witness favorable to the defense, or as a hostile witness, or for cross-examination under Federal Rule of Evidence 806,[10] then it is difficult to see what, if anything, is gained by a rule that requires the prosecution to make that declarant "available."[11]

While the benefits seem slight, the burden imposed by the Court of Appeals' unavailability rule is significant. A constitutional rule requiring a determination of availability every time the prosecution seeks to introduce a co-conspirator's declaration automatically adds another avenue of appellate review in these complex cases. The co-conspirator rule apparently is the most frequently used exception to the hearsay rule. See 4 D. Louisell & C. Mueller,

---

[10] It is not clear from the Court of Appeals' opinion whether in order to meet its burden of showing unavailability, the prosecution would be required to call the declarant as a witness, or only to ensure that the declarant is available for testimony if needed. The unavailability rule suffers from many of the same flaws under either interpretation, and in fact may be even less defensible under an interpretation requiring the prosecution to call each declarant as a witness.

[11] In addition to the reasons mentioned in the text why an unavailability rule would be of little value, many co-conspirator statements are not introduced to prove the truth of the matter asserted, and thus do not come within the traditional definition of hearsay, even without the special exemption of Federal Rule of Evidence 801(d)(2)(E). Thus, some of the out-of-court statements in this case presumably could be admitted without implicating the Confrontation Clause. For example, in one of the recorded phone conversations Levan and Lazaro discuss the missing tray with Lazaro suggesting that "Mike" took it and speculating about who set Lazaro up for the May 25 stop. 748 F. 2d, at 815. Certainly these statements were not introduced in order to prove the truth of the matters asserted, but as background for the conspiracy, or to explain the significance of certain events. We explained just last Term that admission of non-hearsay "raises no Confrontation Clause concerns." *Tennessee* v. *Street*, 471 U. S. 409, 414 (1985). Cross-examination regarding such statements would contribute nothing to Confrontation Clause interests.

Federal Evidence § 427, p. 331 (1980).[12]   A rule that required
each invocation of Rule 801(d)(2)(E) to be accompanied by a
decision on the declarant's availability would impose a sub-
stantial burden on the entire criminal justice system.

Moreover, an unavailability rule places a significant practi-
cal burden on the prosecution.   In every case involving co-
conspirator statements, the prosecution would be required to
identify with specificity each declarant, locate those declar-
ants, and then endeavor to ensure their continuing availabil-
ity for trial.   Where declarants are incarcerated there is the
burden on prison officials and marshals of transporting them
to and from the courthouse, as well as the increased risk of
escape.   For unincarcerated declarants the unavailability
rule would require that during the sometimes lengthy period
before trial the Government must endeavor to be aware of
the whereabouts of the declarant or run the risk of a court
determination that its efforts to produce the declarant did not
satisfy the test of "good faith."   See *Ohio* v. *Roberts,* 448
U. S., at 74–77; *id.,* at 77–82 (BRENNAN, J., dissenting); see
also *United States* v. *Ordonez,* 737 F. 2d 793, 802 (CA9
1984).[13]

An unavailability rule would impose all of these burdens
even if neither the prosecution nor the defense wished to ex-
amine the declarant at trial.   Any marginal protection to the
defendant by forcing the government to call as witnesses
those co-conspirator declarants who are available, willing to
testify, hostile to the defense, and yet not already subpoenaed
by the prosecution, when the defendant himself can call and
cross-examine such declarants, cannot support an unavail-

---

[12] Federal Rule of Evidence 801 characterizes out-of-court statements by
co-conspirators as exemptions from, rather than exceptions to, the hearsay
rule.   Whether such statements are termed exemptions or exceptions, the
same Confrontation Clause principles apply.

[13] The court in *Ordonez* found a Confrontation Clause violation because
the Government, after introducing drug ledgers containing entries made
by unidentified co-conspirators, did not adequately demonstrate that it was
totally unable to identify those conspirators.

ability rule. We hold today that the Confrontation Clause does not embody such a rule.

## III

To some degree, respondent's arguments in this case require us to revisit this Court's resolution of this question in *Dutton* v. *Evans*, 400 U. S. 74 (1970). Although *Dutton* involved a state co-conspirator rule instead of Federal Rule of Evidence 801, the state rule actually admitted a broader category of co-conspirator statements. Nevertheless, a plurality of this Court found that the rule did not violate the Confrontation Clause and a fifth Member of the Court, Justice Harlan, reasoned that the Confrontation Clause was not applicable at all. In *Dutton* the plurality stated that "we do not question the validity of the coconspirator exception applied in the federal courts." *Id.*, at 80. Upon closer examination today, we continue to affirm the validity of the use of co-conspirator statements, and we decline to require a showing of the declarant's unavailability as a prerequisite to their admission.

We accordingly reverse the judgment of the Court of Appeals for the Third Circuit.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

With respect to the case before us, the majority takes but a small step. In *Ohio* v. *Roberts*, 448 U. S. 56 (1980), the Court held: "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.*, at 66 (quoting *Dutton* v. *Evans*, 400 U. S. 74, 89 (1970) (plurality opinion)). The majority now assures us that "[t]he reliability of the out-of-court statements is not at issue in this case." *Ante*, at 391, n. 3. Respondent is thus free to return to the Court of Appeals and argue that the

co-conspirator declarations admitted against him lack the "indicia of reliability" demanded by the Confrontation Clause.[1]

With respect to its constitutional analysis, however, the majority makes a giant leap. Even while conceding that the "'very mission'" of the Confrontation Clause is to "'advance "the accuracy of the truth-determining process in criminal trials,"'" *ante*, at 396 (citations omitted), the Court today holds that the Clause is not offended when the prosecution fails to make even the slightest effort to produce for cross-examination the authors of the out-of-court statements with which it hopes to convict a defendant. Because I cannot share the majority's implicit faith that the camaraderie of a criminal conspiracy can substitute for in-court cross-examination to guarantee the reliability of conspiratorial statements, I can neither accept the majority's analysis nor stand silent while the values embodied in the Sixth Amendment are so cavalierly subordinated to prosecutorial efficiency.

## I

## A

In *Ohio* v. *Roberts*, *supra*, after canvassing the many previous cases that had examined the relationship between the

---

[1] Today's decision does nothing to resolve the conflict among the lower courts as to whether declarations of co-conspirators who are not present in court for cross-examination must be shown to have particularized "indicia of reliability" before they can be admitted for substantive purposes against a criminal defendant. Compare *United States* v. *DeLuna*, 763 F. 2d 897 (CA8 1985) (particularized inquiry into reliability of co-conspirator statements demanded in addition to unavailability requirement); *United States* v. *Ordonez*, 722 F. 2d 530, 535 (CA9 1983) (particularized assessment of reliability needed for every statement admitted under co-conspirator hearsay exemption); *United States* v. *Perez*, 702 F. 2d 33 (CA2) (same), cert. denied, 462 U. S. 1108 (1983), with *Boone* v. *Marshall*, 760 F. 2d 117, 119 (CA6 1985) (declaration admitted under co-conspirator exemption "automatically satisfies the Sixth Amendment requirements"); *United States* v. *Molt*, 758 F. 2d 1198 (CA7 1985) (same); *Ottomano* v. *United States*, 468 F. 2d 269, 273 (CA1 1972) (same), cert. denied, 409 U. S. 1128 (1973). See Mueller, The Federal Coconspirator Exception: Action, Assertion, and Hearsay, 12 Hofstra L. Rev. 323, 361–362, and nn. 131–132 (1984).

Confrontation Clause of the Sixth Amendment and the many exceptions to the hearsay rule, the Court noted:

"The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. . . .

"The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Id.*, at 65 (quoting *Snyder* v. *Massachusetts*, 291 U. S. 97, 107 (1934)).

This sweeping language was in no way limited to any particular variety of out-of-court declarations, and the Third Circuit panel that the Court reverses today was hardly alone in believing the rule in *Roberts* to be applicable to all such declarations. See, *e. g., United States* v. *Massa*, 740 F. 2d 629, 639 (CA8 1984); *Haggins* v. *Warden*, 715 F. 2d 1050, 1055 (CA6 1983), cert. denied, 464 U. S. 1071 (1984); see also *United States* v. *Caputo*, 758 F. 2d 944, 950, n. 2 (CA3 1985) (collecting cases). The majority, however, now tells us that *Roberts* "simply reaffirmed a longstanding rule . . . that applies unavailability analysis to prior testimony." *Ante*, at 394. This effort to confine *Roberts* misconstrues both the meaning of that decision and the essential command of the Confrontation Clause.

Contrary to the majority's suggestion, it is clear that the *Roberts* Court consciously sought to lay down an analytical

framework applicable to all out-of-court declarations introduced by the prosecution for the truth they contain. JUSTICE BLACKMUN, writing for the Court, introduced his affirmation of the Confrontation Clause's twin requirements of unavailability and reliability by noting: "The Court has not sought to 'map out a theory of the Confrontation Clause that would determine the validity of all ⁝ . . . hearsay "exceptions."'" *California* v. *Green*, 399 U. S. [149,] 162 [1970]. But a general approach to the problem is discernible." 448 U. S., at 64–65. For its general principles, the *Roberts* Court of course turned to a number of cases involving former testimony, *e. g.*, *Mancusi* v. *Stubbs*, 408 U. S. 204 (1972); *Barber* v. *Page*, 390 U. S. 719 (1968); *Motes* v. *United States*, 178 U. S. 458 (1900); *California* v. *Green*, 399 U. S. 149 (1970) (all cited at 448 U. S., at 65). But it also relied on *Dutton* v. *Evans*, 400 U. S. 74 (1970) (cited at 448 U. S., at 65, n. 7, and 66), where the hearsay had been admitted pursuant to the Georgia co-conspirator exception, and *Douglas* v. *Alabama*, 380 U. S. 415 (1965) (cited at 448 U. S., at 63), which involved an accomplice's confession. Indeed, it was on *Douglas* that *Roberts* relied for the proposition that "the Confrontation Clause reflects a preference for face-to-face confrontation at trial, and that a 'primary interest secured by [the provision] is the right of cross-examination.'" 448 U. S., at 63 (footnote omitted) (quoting *Douglas, supra,* at 418).

The absence of any language in *Roberts* confining its analysis to prior testimony is not surprising. The Court simply recognized that whenever the prosecution seeks to convict a defendant by relying on the truth asserted in out-of-court declarations, confrontation and cross-examination of the declarant in open court are the most trusted guarantors of the reliability that is the primary concern of the Confrontation Clause. The need for these guarantors is as critical in cases involving the extrajudicial statements of co-conspirators as it is in cases involving the prior testimony of an absent declarant or the confession of an accomplice.

## B

When the prosecution introduces the statements of a co-conspirator merely to show what the declarant might have been thinking or what he wished his listeners to believe at the time he spoke, neither the rule against hearsay nor the Confrontation Clause is implicated by their admission against a defendant. See *Tennessee* v. *Street*, 471 U. S. 409 (1985). However, when the prosecution invokes the co-conspirator exemption to the hearsay rule, as it does in this case, it is urging the truth of the matters asserted in the extrajudicial statements. The question here must be whether we have so much confidence in the factual accuracy of statements made by conspirators in furtherance of their conspiracy that we deem the testing of these statements by cross-examination unnecessary to guarantee the reliability of a trial's result.

The majority is quite right to suggest that "[c]onspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand." *Ante*, at 395. However, the differences between an accomplice's conspiratorial utterances and his testimony in court are not merely those of diction and demeanor. That a statement was truly made "in furtherance" of a conspiracy cannot possibly be a guarantee, or even an indicium, of its reliability. See Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv. L. Rev. 1378, 1384–1391 (1972); Note, Federal Rule of Evidence 801(d)(2)(E) and the Confrontation Clause: Closing the Window of Admissibility for Coconspirator Hearsay, 53 Ford. L. Rev. 1291, 1311–1312 (1985). As one commentator has noted:

> "Conspirators' declarations are good to prove that some conspiracy exists but less trustworthy to show its aims and membership. The conspirator's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different

members) and other aims than in fact it has. It is no victory for common sense to make a belief that criminals are notorious for their veracity the basis for law." Levie, Hearsay and Conspiracy, 52 Mich. L. Rev. 1159, 1165–1166 (1954).

The unreliability of co-conspirator declarations as trial evidence is not merely a product of the duplicity with which criminals often conduct their business. It also stems from the ambiguities that so often appear in all casual conversations, not just those of outlaws. See, *e. g.*, *Dutton* v. *Evans*, *supra*, at 104 (MARSHALL, J., dissenting). And the difficulties one has in making sense of slang and dialect can be compounded where conspirators use private codes, as indeed they did in this case. Because of these problems, trained case agents are often hard pressed to piece together the facts of a criminal conspiracy from the confused tangle of conversations they have intercepted. The appearance of a co-conspirator declarant in court will allow the elimination of ambiguity that neither side has a right to profit from.

## C

Consideration of the reasons why co-conspirator declarations have been exempted from the rule against hearsay only confirms doubts as to the reliability of the truth asserted in those statements. In contrast to other types of statements excepted from the rule, the co-conspirator declarations have not been admitted because of a belief in their special reliability. See Davenport, *supra*, at 1384–1385; Levie, *supra*, at 1161–1167. Rather, the root of the exemption lies in substantive law. Under the agency theory that supports conspiracy law, "once the conspiracy or combination is established, the act of one conspirator, in the prosecution of the enterprise, is considered the act of all, and is evidence against all." *United States* v. *Gooding*, 12 Wheat. 460, 469 (1827). Every statement of co-conspirators in furtherance of

their illegal scheme is thus a verbal act admissible against each conspirator as if it had been his own.

This agency theory, which even the Advisory Committee on the proposed Federal Rules of Evidence labeled "at best a fiction," Advisory Committee Notes on Fed. Rule Evid. 801(d)(2)(E), 28 U. S. C. App., p. 718, might justify the exemption conferred upon co-conspirator declarations from the traditional rule against hearsay. But it speaks not at all to the Confrontation Clause's concern for reliable factfinding.

## II

Without even attempting to argue that co-conspirator declarations have an inherent reliability that might justify their admission at trial when the declarant is not present in court for cross-examination, the majority instead supports its holding by arguing that "it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force." *Ante,* at 395. Indeed, the Court asserts, "co-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence." *Ante,* at 395–396.

I truly cannot understand the majority's fear that a rule requiring the prosecution to do its best to produce a co-conspirator declarant in court would somehow deprive triers of fact of valuable evidence. Under this rule, if the prosecution could not in all good faith produce the declarant, the extrajudicial statements could come in, so long as they could be shown to have "adequate 'indicia of reliability,'" *Roberts,* 448 U. S., at 66. The majority's fear must therefore stem from a notion that if the prosecution is able to produce the declarant in court, his presence will somehow prevent the jury from hearing the truth. This conclusion overlooks the critical importance of cross-examination in the truth-seeking process.

If a declarant takes the stand, his out-of-court statements will still be admitted as evidence, so long as they are sufficiently reliable and there are no other grounds for their exclusion. And cross-examination will only enhance their value to the jury. The defendant will have a chance to inquire into the circumstances under which the statements were made and the motives that might have led the declarant to color their truth at the time. Cross-examination also may force the declarant to clarify ambiguous phrases and coded references. If anything he says is inconsistent with his prior statement, the declarant will no doubt advance some explanation for the inaccuracy of the extrajudicial statement—"an explanation a jury may be expected to understand and take into account in deciding which, if either, of the statements represents the truth," *California* v. *Green,* 399 U. S. 149, 159 (1970). Cf. *Nelson* v. *O'Neil* 402 U. S. 622, 627–629 (1971).

Whether or not a co-conspirator produced in court affirms, denies, or qualifies the truth of his out-of-court statement, his presence will contribute to the accuracy of the factfinding enterprise, the accuracy that is the primary concern of the Confrontation Clause. Whatever truth is contained in his extrajudicial declarations cannot be lost. It can only be supplemented by additional information of no less use to the triers of fact.

## III

Recognizing that there may well be cases in which the cross-examination of a co-conspirator declarant is indispensable to a defendant's case, the Court reminds us that a defendant can always exercise his rights under the Compulsory Process Clause and call the declarant as his own witness. As long as this option remains open to a defendant, the Court reasons, "it is difficult to see what, if anything, is gained by a rule that requires the prosecution to make that declarant 'available.'" *Ante,* at 398. However, even assuming, as the Court seems to do, that the "good faith standard governing

the state's obligation to produce defense witnesses [pursuant to the Compulsory Process Clause] is precisely the same one that governs the state's obligation to confront a defendant with the witnesses against him [pursuant to the Confrontation Clause]," Westen, Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases, 91 Harv. L. Rev. 567, 588 (1978), this is not a satisfactory response to respondent's Confrontation Clause claim.

The short answer to the majority's argument is that the Confrontation Clause gives a defendant a *right* to be confronted with the witnesses against him, not merely an opportunity to seek out witnesses on his own. As one court once noted of a situation similar to that presented in this case:

> "That [a co-conspirator declarant] was available to be called as a witness does not mitigate the prosecution's misconduct here. The State sought to shift to the defendant the risk of calling [the declarant] to the stand. To accept the State's argument that the availability of [the declarant] is the equivalent of putting him on the stand and subjecting him to cross-examination would severely alter the presumptions of innocence and the burdens of proof which protect the accused." *Hoover* v. *Beto*, 439 F. 2d 913, 924 (CA5 1971) (Wisdom, J.), rev'd on rehearing en banc, 467 F. 2d 516 (CA5) (over dissent of seven judges), cert. denied, 409 U. S. 1086 (1972).

See also *Dutton* v. *Evans*, 400 U. S., at 104 (MARSHALL, J., dissenting).

The disadvantages that the majority would impose upon a defendant are not merely theoretical. The Court notes the "significant practical burden" placed on the prosecution by a requirement that the Government identify co-conspirator declarants with specificity. *Ante*, at 399. As an illustration of the difficulties that the prosecution would be forced to face, the majority refers to *United States* v. *Ordonez*, 737 F. 2d 793 (CA9 1984), where the court found a Confrontation Clause violation in the Government's failure to identify the

individuals who had made the entries in the "drug ledgers" introduced as evidence against the defendant. *Ante*, at 399, n. 13. However, the Court now places this "significant practical burden" upon the defendant, who may well be in no better a position to make such identifications. Even were it proper to assume the defendant's guilt and impute to him knowledge regarding pending charges, it can hardly be claimed that a defendant who has played but a minor role in a complex conspiracy necessarily has an intimate knowledge of the names and activities of his alleged co-conspirators.[2] "The prosecution therefore [should have] the burden of producing and calling to the witness stand the persons whose out-of-court statements it uses against the accused because, as between the two sides, the prosecution is in a better position to identify them and to initiate their production at that time." Westen, *supra*, at 616.

Even when a defendant is in as good a position as the prosecution to subpoena available declarants, a rule requiring him to call those declarants as his own witnesses may deny the defendant certain tactical advantages vouchsafed him by the Confrontation Clause. Under the regime established today, the only cross-examination that will attend the prosecution's introduction of co-conspirator declarations will be of whoever heard or recorded those statements and will focus merely on whether or not the statements were actually made. Any inquiry into the reliability of the statements must await the defendant's case. But if the defendant chooses to call the declarant as a defense witness, defendant risks bolstering in the jury's eyes the very conspiracy allegations he wishes to rebut. That the witness is viewed as hostile by the defendant, and has possibly been certified as such by the trial judge, does not necessarily mean that his relationship to the defendant will be so perceived by the jury, unless defense counsel

---

[2] I realize that this was not the case here. However, the Court's holding addresses all cases involving co-conspirator declarations and thus extends to all the hypotheticals I discuss.

chooses to dramatize the antagonism with hyperbole that might lose him the sympathy of the jury.

Moreover, even the harshest grilling of a declarant by the defense can occur only after the prosecution has rested its case. In a complex conspiracy trial, the time elapsing between the introduction of the hearsay and the cross-examination of the declarant may be quite substantial. During this time, the declarations will be unrebutted in jurors' minds. And their effect may actually be enhanced should either the defense or prosecution repeat the statements in the course of examining the declarant. In short, "[o]nly a lawyer without trial experience would suggest that the limited right to impeach one's own witness is the equivalent of that right to immediate cross-examination which has always been regarded as the greatest safeguard of American trial procedure." *New York Life Ins. Co.* v. *Taylor,* 79 U. S. App. D. C. 66, 74, 147 F. 2d 297, 305 (1945); see *United States* v. *Oates,* 560 F. 2d 45, 82, n. 39 (CA2 1977).

In federal prosecutions, there is an additional drawback. When a defendant calls a declarant as his own witness, he has no statutory right to obtain any prior statements of that declarant in the Government's possession—a right that attaches only "[a]fter a witness called by the United States has testified on direct examination," 18 U. S. C. § 3500.

In view of all the disadvantages that attend a defendant's decision to call a co-conspirator declarant as a witness, the majority's reliance on the defendant's right to compulsory process to justify a decision to deprive him of a critical aspect of his Confrontation Clause right cannot be supported. The two are simply not equivalent. Moreover, the majority's belief that an unavailability requirement would contribute nothing but a cast of unwanted supernumeraries has no basis in the realities of criminal prosecutions. There might be instances in which an available declarant is of so little value to either side that calling him as a witness would truly be an unnecessary exercise. See, *e. g., Anderson* v. *United States,*

417 U. S. 211, 220, n. 11 (1974). But a defendant's failure to call a declarant as his own witness can in no way be taken as proof that such is the case.

## IV

At bottom, today's decision rests upon the Court's judgment that a defendant's constitutional interest in subjecting the extrajudicial declarations of co-conspirators to the cross-examination that has traditionally been the primary guarantee of reliability in trials must be subordinated to considerations of prosecutorial efficiency. I do not believe the concerns of the Confrontation Clause should be so easily disregarded. The plight of Sir Walter Raleigh, condemned on the deposition of an alleged accomplice who had since recanted, may have loomed large in the eyes of those who drafted that constitutional guarantee. See F. Heller, The Sixth Amendment 104 (1951); Stephen, The Trial of Sir Walter Raleigh, in 2 Transactions of the Royal Historical Society 172 (4th series 1919). But the Framers, had they the prescience, would surely have been as apprehensive of the spectacle of a defendant's conviction upon the testimony of a handful of surveillance technicians and a very large box of tapes recording the boasts, faulty recollections, and coded or ambiguous utterances of outlaws. The Court's decision helps clear the way for this spectacle to become a common occurrence. I dissent.