**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dwain KNIGGE, Defendant-Appellant.**

**No. 86–5099.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1987.

Decided Nov. 16, 1987.

Edward T. Wells, Salt Lake City, Utah, for defendant-appellant.

Curtis B. Rappe, Los Angeles, Cal., for plaintiff-appellee.

Before ANDERSON, FERGUSON and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Dwain Knigge appeals his conviction of wire fraud in violation of 18 U.S.C. § 1343; conspiracy to commit wire fraud, to transport in interstate commerce property taken by fraud, and to commit bribery all in violation of 18 U.S.C. § 371; and of travel to commit bribery in violation of Utah State

Law and in violation of 18 U.S.C. § 1952. We affirm the conviction.

## FACTS

In 1975 Dominic Del Grande was the secretary-treasurer and stock transfer agent of G.E.T., a small research and development company in San Diego, California. Del Grande stole a stock certificate of 500,000 shares of stock belonging to the company's president, C.R. Possell and canceled it. In debt to a sinister group of lenders, Del Grande paid off by issuing new certificates in place of the old, making them out in the name of four Mexicans who had no right to the stock and no part in any conspiracy and whose names were used as covers, and delivering nine such certificates representing a total of 402,000 shares to Robert Paduano and his associates, Al Madrid, Nick Nardi and Michael Rizzitello.

In 1981 the stock was selling for about $5.00 a share and the illegitimate certificates were worth about $2 million, if they could be negotiated. Possell had discovered the loss of his certificate and knew about the fraudulent certificates issued in its place. G.E.T. had put a stop transfer in effect on their transfer. Del Grande had in the meanwhile died. The new stock transfer agent was American Registrar and Transfer Co. of Salt Lake City, Utah. Its owner was Knigge.

The problem of their possessors was to circumvent the order and obtain new, negotiable certificates. To obtain their objective, Paduano and his associates involved John Hanna Brownfield, who in turn enlisted John James Badger, a stock promoter in Salt Lake City. Paduano, Brownfield and Badger developed a plan in accordance with which the certificates would be presented to the transfer agent for payment and a suit brought to set aside the stop order; Knigge would be bribed to cause the transfer agent to consent to the suit and would then issue the new certificates. The plan had some initial success. Brownfield went to Salt Lake City, hired a lawyer, Robert Meredith, and filed suit against Knigge's company. Without telling G.E.T. of the suit, Knigge on May 9, 1981 consented to judgment and the same day issued the new certificates. In return for his services, Knigge in May and June 1981 was paid a portion of the stock.

## ANALYSIS

Knigge, Brownfield and Badger were tried together. All were convicted. In his appeal Knigge primarily challenges the admission of certain evidence against him. We will review each challenge in turn.

■ 1. *The Admissibility of the Testimony of Deidre Burton.* Burton was the administrative assistant of Paduano in his capacity as president of TICO Financial, a financial services company, in whose name 300,000 of the new certificates were issued; she was also secretary-treasurer of this company and Paduano's live-in girlfriend. She testified extensively as to Paduano's arrangements with Brownfield and as to how Brownfield brought back from Salt Lake City certificates for 300,000 shares of G.E.T. stock on May 14, 1981 and $82,000 in cashier's checks on May 21, 1981. After depositing these checks, Burton met with Brownfield and Paduano to discuss the division of the G.E.T. stock and its proceeds. Brownfield produced a diagram. The diagram showed that 402,000 shares had been obtained; that he had brought back 300,000; and that the rest had gone either directly or through nominees to Brownfield himself, Badger, and Knigge.

This testimony was admitted against all three defendants. It was properly admitted. Brownfield's diagram and his accompanying explanation were statements of a co-conspirator with Burton and Knigge. That a conspiracy existed involving Knigge and Brownfield was proved by the statements themselves, *United States v. Bourjaily,* —— U.S. ——, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987), as well by the other evidence of conspiracy set out below:

(1) Although Knigge informed G.E.T. when Brownfield's suit was first brought against American Registrar and Transfer and G.E.T. had its counsel, Marvin Sears, discuss the suit with Knigge, and although Knigge was told by Sears that some of the

shares at issue came from the stolen certificate, Knigge failed to inform Sears when the complaint was amended to make G.E.T. a defendant and Knigge consented to judgment in the suit without either giving notice to G.E.T. or raising the objection that the shares were based on a theft. Knigge falsely told Meredith, Brownfield's attorney, that G.E.T. was "perfectly satisfied that the shares were transferable and were legitimate" and that he would therefore consent to judgment.

(2) Knigge received part of the proceeds from Brownfield's plan. Tony Ladakis was one of Brownfield's intermediaries in Salt Lake City. On May 20, 1981, he received a G.E.T. certificate from Brownfield for 4,000 shares, of which he entered 1,300 shares in Dwain Knigge's account at Northridge Securities. Knigge thanked Ladakis and on the same day sold the stock for $5,460. Two other certificates, representing 2,500 shares apiece and traceable to the new G.E.T. certificates, were placed in accounts at Western Capital and Securities. The accounts were in the names of Knigge's twin sons. Knigge sold the shares and told the boys that the shares were gifts from him.

(3) On June 22, 1982 Agent Ralph Lumpkin of the Federal Bureau of Investigation interviewed Knigge, telling him that he was investigating the allegation that Knigge had been linked to the transfer of 402,000 shares of G.E.T. stock. Knigge told him that he had transferred the stock because Sears, counsel for G.E.T. had told him it was okay to do so. This statement was a falsehood, protecting Knigge and the others involved.

■ To prove a conspiracy in order to obtain admission of a co-conspirator's statements, the government need only prove the existence of the conspiracy by a preponderance of the evidence. In this case, Knigge's lies, his acquiescence in the sham suit where some of the stock involved was to his knowledge based on a stolen certificate, and his participation in the proceeds proved that the conspiracy existed.

The statements reported by Burton were made by Brownfield in the course of the conspiracy and in furtherance of the conspiracy, for what Brownfield had to say bore on the division of the spoils of the conspiracy. The testimony was an exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E).

■ 2. *The Testimony of Elroy Richard Giddens.* Giddens is a man of wide experience: a seaman in the United States Navy, honorably discharged; a soldier in Vietnam, decorated and honorably discharged; the manager of a finance company; a policeman with the Anaheim Police Department; a law student at Western State University in Orange County; a teacher at the same institution, teaching Wills, Trusts, and Contractual Law; the financier of an amphetamine operation, from which he made $7,000; a felon convicted for his part in the distribution of this drug; and a lawyer disbarred in October 1981 for the same offense. *In re Giddens,* 30 Cal.3d 110, 177 Cal.Rptr. 673, 635 P.2d 166 (1981). At Western, Brownfield had been his student and was later his law clerk.

Released from prison in 1979, Giddens discussed various business ventures with Brownfield and began to share office space with him in El Toro, California. In March of 1981 Brownfield consulted Giddens about the G.E.T. stock certificate and his plan to file a lawsuit as their bona fide purchaser in order to get rid of the stop transfer order. Brownfield told Giddens the stock was "hot", meaning "stolen". Giddens knew Brownfield was not a bona fide purchaser and advised him that he would commit perjury in bringing the suit. Giddens suggested a direct approach to G.E.T. in San Diego. Brownfield told Giddens that he, Brownfield, would be paid for what he did and that this money, plus credit Paduano would extend, would help launch a clothing business Brownfield and Giddens were planning to start. Giddens, thus, as he testified, had "indirectly" an interest in Brownfield's suit. They discussed the suit "in many conversations." Giddens asked Brownfield questions "to protect himself." He did not want Brown-

field to get into trouble and was looking out for "him and me both."

When Brownfield went to Salt Lake City he telephoned Giddens to tell him that the complaint had been filed and that if Paduano called in to tell him everything was all right. On his return from Salt Lake City, Giddens and Brownfield reviewed the complaint and Giddens pointed to an apparent deficiency, which Brownfield said he would ask Meredith, the Salt Lake City attorney, to remedy. In May 1981 Brownfield returned to Salt Lake City and told Giddens that G.E.T. had confessed judgment in the suit. Later in May Brownfield showed Giddens certificates for 300,000 shares of G.E.T. stock in the name of TICO Financial. Brownfield also told Giddens that he had $100,000 in cashier's checks derived from the sale of the G.E.T. stock. During May and June, Nardi and Rizzitello called the office a number of times. Brownfield told Giddens that the stock originally came from them and that they had sent it to Salt Lake City "to get it cleaned up" and had paid too much for this cleaning. He said that they "wanted answers," that is, that he had to account for "all the stock and all the money from the stocks that had been sold." Giddens wanted "to stay on top of what was going on." Brownfield showed Giddens a diagram of how the 402,000 shares or their proceeds were being distributed and said he intended to show it to Nardi and Rizzitello. Knigge was listed on the diagram as a recipient.

On June 2, 1981 Brownfield and Giddens traveled together to Salt Lake City "to find out where all the stock went." Their reservations were made by Deidre Burton at TICO Financial. Badger met them and delivered a brown bag of cash to Brownfield. Brownfield counted the money and said it was $4,000 short; Badger said that 20% had gone to the nominee who sold the stock. Brownfield insisted on meeting the nominee. Badger joined by Meredith and the nominee, then met with Brownfield and Giddens at Dooley's, a club. After the nominee had defended himself and left, Brownfield said that he "had to have some answers for the guys in Los Angeles about where all the stock went." Badger replied,

"I have to pay off the transfer agent, I have to pay the attorney, I have to pay the broker, I have to pay the nominees, I have to pay the brokerage houses. It cost a lot of money. Everybody knows it's a hot stock, so they won't do it free."

After this discussion, Badger, Brownfield and Giddens went to the Capital City Bank where Brownfield and Giddens opened an account in the name of "Liberty Oil Corporation" with their names as signatories on the account, and with withdrawals to be made only on their joint signatures. The cash delivered to Brownfield, converted into cashier's checks, was deposited in this account. Giddens also later put money of his own in this account and with Brownfield's approval later drew on it.

Brownfield, Badger, Giddens, and Meredith then met at the Cabana Club, where there was much drinking and Brownfield pressed for a further accounting by Badger of the 100,000 G.E.T. shares Badger had had. Badger again said that he had to "pay off the transfer agent." Brownfield said, "You only gave the transfer agent a few thousand dollars." Giddens asked why it did any good to buy off the transfer agent. Badger said that the agent could transfer the stock whether the company wanted him to or not. In this case the transfer agent "accepted service on behalf of General Enertech and confessed judgment, and they didn't know about it, General Enertech."

Later in the afternoon Knigge himself joined the group. Knigge said to Badger, "I only got half of the $10,000. Where's the rest?" Badger said, "You are getting an apportionate share of the stock as it's being sold off. And we can't sell it too soon. It will depress the market, and General Enertech will find out that their stocks are being traded. If they find out the stocks are being traded, they will fire you as a transfer agent, and the whole thing will be over." Knigge said, "I know that but I still want my money." Brownfield was angry because he had been told Knigge was already paid. After Knigge left, Badger said, "We'll pay him only what

we have to. We need him to finish the deal."

Back at the hotel, Brownfield and Giddens went over "the role" played by Badger and Knigge. Brownfield said the suit had been a sham and judgment in it confessed "unbeknownst" to G.E.T. Giddens asked Brownfield why he had earlier lyingly told him that G.E.T. had confessed judgment. The next morning Giddens asked Brownfield how he expected to get away with it; sooner or later G.E.T. was going to find out their stock was being transferred and traded. Brownfield said, "The transfer agent will handle that. That's what he is paid for."

On June 9, 1981 Giddens again flew to Salt Lake City with Brownfield. Again they met with Giddens and Meredith, and again Brownfield insisted on an accounting. Knigge joined them. Knigge said, "I still haven't got the rest of my money." Badger again explained the need to take time selling the stock. Knigge remained angry, and Brownfield took him aside to calm him down.

About July 1, 1981, Brownfield and Giddens met Nardi, Rizzitello, Joan Sutherland (a friend of Brownfield) and Lew Caveretti at the Hyatt Hotel near the Los Angeles airport. Rizzitello demanded an accounting. Brownfield said everything he had done in Salt Lake City had been cleared by Paduano. Brownfield spoke of the division made between TICO Financial; Paduano personally; Badger; Meredith; the nominees; and Knigge. Rizzitello objected that there was now a stop transfer order on the 300,000 shares he had, so he had paid "half a million dollars" for nothing. Brownfield offered to give him the money he'd made from the deal. Rizzitello said, "That's a drop in the bucket."

In September of 1981 Brownfield and Giddens were sharing a new office in Tustin, California. Brownfield told Giddens that the G.E.T. stock could be "re-released" if they paid a Mr. Kagel. Badger would again be the intermediary. In October 1981 Badger telephoned Giddens and told him that he had reached an agreement with Kagel by which the G.E.T. stock would become transferable. This plan was never carried out.

The government for its own reasons chose not to indict Giddens as a co-conspirator; but despite his weak disclaimer, "I was not in on the deal," it is evident from his own testimony that Giddens was a co-conspirator with Brownfield, Badger and Knigge in the plot to transfer the G.E.T. stock and make money from the transfer. In March of 1981 he knew of Brownfield's plan to turn the stolen certificates into cash. He advised Brownfield on this plan. He accompanied Brownfield to Salt Lake City to work on the division of the proceeds. At least one trip was arranged by TICO Financial. He put part of the proceeds in an account, access to which he controlled and on which he drew. He dealt on the telephone with Paduano and his associates and with Badger. He participated in the meeting where the associates called for an accounting. As late as October 1981 he was active in trying to beat the new stop order and to make the new certificates negotiable. If Brownfield was up to his neck in the conspiracy, Giddens was at least waist high.

All of the conversations to which Giddens testified were made during the course of the conspiracy that ran from March 1981 to at least October 1981. Of course the conspiracy was not over when the first stop order was lifted. The stock had to be sold slowly. A new stop order blocked the transfer of 300,000 of the shares. The stock had to be turned into cash. The proceeds had to be divided. Giddens worked actively to these ends.

All of the conversations to which Giddens testified were in furtherance of the conspiracy. They related to the plan of action to free the stock, to the division of the spoils, to the accounting for the spoils. The conversations Giddens had alone with Brownfield bore on the *modus operandi* of the conspirators. To be effective, Giddens, as he said, had to "stay on top" of what was going on; he had to ask questions to protect Brownfield and to protect himself.

Knigge attacks the reliability of the hearsay. Giddens was an ex-felon and ex-law-

yer, anxious that the government not prosecute him for the very conspiracy about which he was testifying. By Giddens' own admission, Brownfield lied to him once about the Salt Lake City suit, and Brownfield accused Badger of misleading him about the final payment to Knigge.

All of these reasons to discount Giddens' report of what he heard were before the jury. Giddens' status and various other matters bearing on his credibility were in evidence, and it was for the jury to determine if what he reported was still credible. Giddens' report of Brownfield's one lie and Brownfield's skepticism about Badger's reports to him necessarily qualified the weight to be put on Brownfield and Badger's declarations involving Knigge but did not automatically make them untrustworthy. That both Brownfield and Badger had a motive to lie in order to account for where the G.E.T. stock had gone has to be considered against the evidentiary force of the statements of the co-conspirators as they tried to arrange for the division of their loot. Co-conspirators' statements are "usually irreplaceable as substantive evidence." *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 1127, 89 L.Ed.2d 390 (1987):

> Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. When the Government—as here—offers the statement of one drug dealer to another in furtherance of an illegal conspiracy, the statement often will derive its significance from the circumstances in which it was made. Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand. Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy. *Id.* 106 S.Ct. at 1126.

So in this case the statements of Badger and Brownfield are both qualified by the circumstances in which they were made

and draw value from the circumstances. Their reliability is corroborated by their fit with the facts otherwise known about Knigge, of which his consent to Brownfield's suit and his sharing in the loot are only the most prominent. The hearsay testified to by Giddens met the requirements of, and was admissible under, Fed.R.Evid. 801(d)(2)(E).

The admissibility of all of the statements of Brownfield under section 801(d)(2)(E) make it unnecessary for us to rule on whether some of them met the criteria of *United States v. Layton,* 720 F.2d 548, 559 (9th Cir.1983) for admission as declarations against penal interest. Two declarations—those made at the hotel the evening of June 2, 1982 and the morning of June 3—were admitted on that basis, but we may affirm on the basis of the more comprehensive theory of admissibility under section 801(d)(2)(E). *Cf. United States v. Green,* 648 F.2d 587, 592 (9th Cir.1981); *United States v. Gocke,* 507 F.2d 820, 824 n. 4 (8th Cir.1974).

■ Knigge's contention that the admission of this evidence violated his right under the Sixth Amendment "to be confronted with the witnesses against him" is completely answered by *Bourjaily,* repeating the earlier holding of *Delaney v. United States,* 263 U.S. 586, 590, 44 S.Ct. 206, 207, 68 L.Ed. 462 (1924) that "there can be no separate Confrontation Clause challenge to the admission of a co-conspirator's out-of-court statement." *United States v. Bourjaily,* —— U.S. ——, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987). "[T]he Confrontation Clause does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)." *Id.*

■ 3. *The Admissibility of Knigge's Handwritten Notes.* Knigge's secretary testified that these notes were in Knigge's handwriting. The notes traced some of the nine certificates to the missing Possell certificate. They were admitted into evidence without objection. Nearly a month later the defendant asked the court to rescind its earlier ruling. The time the notes were

prepared was not established, but it was reasonable to infer that Knigge wrote them at the time he was considering making the transfer. The admission of the notes was not plain error.

■ 4. *Admission of the Records of Northridge Securities.* The government produced evidence of records kept by the "back room" of this brokerage firm and authenticated them through the testimony of Michael Doolin, a trader. He testified that he personally dealt with Ladakis, who deposited the shares in three accounts, one of them Knigge's, and that he dealt personally with Knigge who instructed him to sell the shares. He filled out the top portion of the trade tickets and sent them to the back room. He identified his handwriting on the tops of the trade tickets, but could not personally vouch for the rest of the documents. The relevant testimony by Doolin concerned the trades which led to Knigge receiving the proceeds of the stock. These records were properly admitted. We need not decide and do not decide whether the other records were properly admitted because even if by hypothesis they were not their admission was harmless.

5. *The Admissibility of the Stock Transfer Records Prepared by Del Grande.* These were stock transfer records prepared by Del Grande, the former transfer agent, showing the cancellation of the Possell certificate and the issue of the new certificates. The government did not seek to have them admitted as hearsay under the business records exception to the hearsay rule. They were introduced not to prove the truth of anything but to provide a foundation for testimony regarding the transfers involving the nine certificates, whose origin was the missing Possell certificate.

■ The hearsay rule does not apply to evidence offered "to establish a foundation for later showing, through other admissible evidence that it was false." *Anderson v. United States,* 417 U.S. 211, 220, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974); *United States v. Adkins,* 741 F.2d 744, 746 (5th Cir.1984), *cert. denied* 471 U.S. 1053, 105 S.Ct. 2113, 85 L.Ed.2d 478 (1985). These records said nothing in themselves. They were mute pieces of circumstantial evidence whose significance became clear only by the clearly admissible testimony of Possell that someone had taken his certificate and the Mexicans' testimony that they had not bought, sold, or traded stock other than the 2,500 shares apiece which they had originally acquired. There was no ground to raise a hearsay objection because the records were not hearsay, nor was there any reason to give a limiting instruction when there was nothing in the records which proved anything and their damning significance depended completely on the testimony of the witnesses who showed that they were records of unauthorized transfers.

■ Summaries of these records made by Agent John Charles Jones of the Federal Bureau of Investigation were introduced into evidence. In these summaries Jones explained and charted the transfers that Del Grande's records showed. Jones was permitted, however, to testify on the basis of the records that the certificates presented for transfer on May 6, 1981 were derived from the stolen Possell certificates. In this testimony, the records were used for a purpose for which they were not admitted, viz., to show the truth. Jones' testimony based on the records was erroneously admitted. The error was, however, harmless. The government was not proving Del Grande a criminal but Knigge. Proof of Knigge's precise crimes did not depend on showing the origin of the nine certificates but on showing that he was paid a bribe to breach his fiduciary duty as a transfer agent and to consent to Brownfield's suit. Jones' erroneously admitted testimony did not go to this central issue.

■ 6. *Limitation on the Cross-Examination of Giddens.* On cross-examination counsel accused Giddens of forging a notary's signature on documents and then sought to examine the notary on the forgery. The government objected and this testimony was excluded under Fed.R.Evid. 608(b) precluding the introduction of specific instances of the conduct of a witness for the purpose of attacking the witness's cred-

ibility. The court properly applied the rule. Giddens' bias against Brownfield was brought out by very extensive cross-examinations of Giddens on a civil law suit filed against him by American General Petroleum Co. and Brownfield as its president.

■ 7. *The Admissibility of the Badger-Goldstein Conversation.* In the course of the FBI investigation, Goldstein, a government informer, asked Badger why G.E.T. had changed transfer agents. Badger replied "Well I think they thought that the transfer agent was in cahoots with me ... or else with ... Nardi or somebody." The conversation was taped and introduced in evidence. The evidence was not admissible against Knigge but was admitted against him. It is, however, no more than speculation by Badger and had no probative force. Its admission did not contribute to the conviction of Knigge.

■ 8. *Limitation of the Cross-Examination of Giddens of his Definition of Bribery.* Giddens testified that Badger and Brownfield had spoken of paying off Knigge. On cross-examination Giddens was asked: "Now did anybody tell you that they bribed anybody, use those words?" Giddens replied "No sir." The cross-examiner pressed, "You are inferring from the way you interpret the conversation that someone was bribed based upon the words and the verbiage used, correct?" Giddens answered, "Yes sir." Counsel then attempted to examine Giddens as to what he understood a bribe to be. Defendant's counsel had introduced the term. Giddens was being asked for a legal conclusion. There was no reason to permit the question. The colloquial "paid off" clearly conveyed to the jury what Giddens understood Brownfield and Badger's meaning to be.

■ 9. *The Instructions to the Jury on the Utah Commercial Bribery Statute.* The Utah Commercial Bribery statute requires that a bribe be "contrary to the interests of the employer or principal." *Utah Code Annotated* § 76-6-508(1)(a) and (b). Knigge objects that the term "contrary to the interests" means that there must have been some damage or detriment to the employer and the jury

should have been instructed that there was "real damage or detriment" before the statute came into play. The district court read the statute aloud to the jury verbatim. It was not necessary that the court explain every term. It is clear that there was detriment to Knigge's principal, G.E.T., in the issuance of stock certificates based on false representations: G.E.T. could have been in the position of facing claims from bona fide purchasers of these certificates and. claims from the true owner. Knigge's claim now that there was "no evidence to support the claim of detriment to the company" is baseless.

Knigge further contends that the court should have instructed the jury on the difference between a bribe and a gratuity. His theory is that any stock he received came after the transfers had been completed and were a kind of tip rather than a bribe. The Utah statute does require that a bribe be arranged in advance of the transaction for which the fiduciary is bribed—that is, the crime in Utah—is to agree to accept any benefit from another upon an agreement or understanding "that such benefit *will* influence his conduct". Utah Code Annotated § 76-6-508 (emphasis supplied). The trial court so instructed the jury. It stated, "In order to find the violation of the Utah statute you must find the offer or agreement to offer or receive a bribe was for the purpose of influencing future conduct." The instruction was entirely adequate to explain the statute.

■ 10. *Denial of a Severance to Knigge.* Knigge sought severance because of the proposed testimony of Giddens and Burton and the Goldstein tape, invoking *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* involved a confession by a defendant which inculpated his co-defendant—a confession which was clearly inadmissible against Bruton "under traditional rules of evidence," rather than being a recognized exception to the hearsay rule. *Id.* at 128, 88 S.Ct. at 1623. *Bruton* does not require severance when as here, evidence is properly admitted under firmly-rooted exceptions to the hearsay exception. The special evidentiary val-

ue of a co-conspirator's statement made in the furtherance of a conspiracy has been elaborated on by Justice Powell writing for the Court in *United States v. Inadi,* supra 106 S.Ct. at 1126.

11. *Knigge's Motion for A Directed Verdict of Acquittal and His Motion for a New Trial.* These two motions depended on the exclusion of the evidence already discussed and the claimed violations of the Confrontation Clause. The contention also was made that no bribe under Utah law had been proved. These contentions have all been examined and found baseless.

AFFIRMED.