## No. 25939

## The People of the State of Colorado v. Terrell Braly
(532 P.2d 325)

Decided January 20, 1975.

John P. Moore, Attorney General, John E. Bush, Deputy, E. Ronald Beeks, Assistant, for appellee.

Lee, Bryans, Kelly & Stansfield, Donald D. Cawelti, Chester H. Johnson, Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Lee Belstock, Deputy, for defendant-appellant.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

Defendant Terrell Braly was tried by a jury and convicted of conspiracy to sell narcotic drugs and assault with a deadly weapon. On appeal, defendant challenges the sufficiency of the evidence on both counts and assigns further prejudicial errors at trial. We reverse both convictions.

The circumstances surrounding the charges against the defendant are as follows. Two undercover police officers, agents Carter and O'Dell, attempted to arrange a purchase of fifty pounds of marijuana from one Stahl. Carter contacted Stahl by telephone. Stahl told him that he could sell fifty pounds of marijuana, and that the price would be $4,200. Stahl told Carter to come to his house in Boulder at about 5:30 or 6 that afternoon. Upon the arrival of agents Carter and O'Dell, Mr. Stahl asked to see the money and officer O'Dell showed it to him. Stahl told the officers to return in about a half hour; they then left, and did return at about 6:30.

On their return, the agents went into the Stahl residence. Stahl made a phone call and then told them that he wanted to talk further about the purchase, but not in the house, suggesting the use of the agents' vehicle. There the three talked further about the proposed buy and at about 7 p.m. the agents dropped Stahl off at the hill area in Boulder. They picked him up again at about 8 and returned to Stahl's house. That evening, at about 8:30, there was a knock at the door. Stahl asked the agents to go to the basement bedroom and to wait for him. The agents heard voices upstairs, and then Stahl returned to the basement and gave them a Winston Cigarette pack containing two marijuana cigarettes, explaining that this was a sample of the marijuana that was the subject of the purchase. Stahl told the agents that he had the marijuana but wanted to have the money before they could see the narcotics. Stahl made several trips up and down the stairs. Finally, he took the agents up with him and asked them to remain inside a bedroom upstairs. Stahl, acting as a go-between for the agents and the people in the other bedroom, was given the money which he

showed to the others, who questioned whether it was marked. Agent Carter asked if he could see the marijuana. Shortly thereafter, the deal fell through. Except for an earlier visit, when the agents saw Stahl's mother and sister, no one was seen by the agents in the Stahl house. There was testimony by a surveillant officer that the defendant was in the house while the agents were last there; and the defendant's counsel stipulated that he was there at the time in question.

The events that followed are confusing. When the defendant and his companion left the Stahl house that night, surveillance cars attempted to follow the car that defendant was driving and a car of a companion of Braly. It becomes unclear who was following — or who was trying to elude — whom but the record reflects a classic "cops-and-robbers" chase through the streets of Boulder, complete with squealing tires and U-turns. Six cars were involved, four of which were police vehicles. At one point, however, the car which defendant was driving came alongside a surveillance car and swerved toward it about three times, and the surveillance car took evasive action, swerving toward the right curb. The testimony of the defendant, and of the police, indicates that there were two lanes of travel in that direction, and that defendant's car never left his lane of traffic, nor did it hit the agents' car. Further the testimony indicates that the defendant could have hit the agents' car if he had so desired, and that the agents' car never left the roadway, though its tires squealed and at one point bumped the curb.

Shortly thereafter, defendant was stopped and arrested. The assault charge stems from the interlude in the automobiles. No marijuana, other than the two cigarettes, was recovered. The prosecution's case was established through the testimony of the narcotics and surveillance officers, and through the testimony of Stahl's mother as to what she had overheard and what her son had told her. Stahl never testified, though his statements composed a major portion of the prosecution's evidence.

The defendant testifying in his own behalf, stated that he had gone to the Stahl house in an attempt to take the agents' money and leave, after having been told that the men at Stahl's house were narcotics agents. A Dan Conley testified that he had con-

tacted the defendant on the afternoon of the 6th, and had told him not to go to the Stahl house that night because the people there would be narcotics agents.

## I.

Although hearsay statements of the alleged co-conspirator, Stahl, were introduced against the defendant, he contends that there was not sufficient independent proof of the existence of a conspiracy to sell narcotics.

 Defendant does not quarrel with the well-established exception to the hearsay rule which allows admission into evidence against the defendant of statements of a co-conspirator on the theory that the acts and declarations of one conspirator become the acts and utterances of all conspirators if done during the course of, and in the furtherance of, the conspiracy, *People v. Schlepp,* 184 Colo. 28, 518 P.2d 824 (1974). The defendant does contend, however, that in order to render such evidence admissible against him there must be competent evidence, independent of the hearsay statements, establishing the conspiracy and the defendant's connection therewith. In *Glover v. United States,* 306 F.2d 594 (10th Cir. 1962), the court stated:

"To render evidence of the acts or declarations of an alleged conspirator admissible against an alleged co-conspirator, the existence of the conspiracy must be shown and the connection of the latter therewith established by independent evidence."

The law of Colorado is in accord. In *People v. Schlepp, supra,* Justice Erickson observed:

"Receipt of Corwin's extra-judicial statements as proof was conditional. The prosecution had to establish by proof aliunde a concert of action between the defendants as a condition precedent to the admission of the extrajudicial declarations of a co-defendant. [citing cases]"

 In this case, the prosecution was allowed to introduce statements of Stahl, through the testimony of the agents and Stahl's mother, before any independent proof was offered of the conspiracy. The prosecution was warned that it would have to "tie it in" — that is, that it would have to show the conspiracy by competent, independent evidence. Although the court may, in its discretion, allow the hearsay to be introduced first, the indepen-

dent proof requirement must be met before the jury may consider the hearsay statements of the alleged co-conspirator against the defendant. If sufficient independent proof is not shown, then the jury must be instructed to disregard the testimony. *Beckwith v. United States*, 367 F.2d 458 (10th Cir. 1966). Although the proof of the existence of the conspiracy may be circumstantial, it must be independent of the hearsay statements. *See People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973).

In this case, the issue is whether there was evidence, direct or circumstantial, apart from the hearsay statements, sufficient to support a determination of the existence of the conspiracy. We hold that there was not.

This is not the same fact situation as was found in *People v. Schlepp, supra,* in which (although as here, the undercover agents did not talk directly with the defendant at any time) they observed a brief conversation between the defendant and the go-between who negotiated the buy, and they observed the defendant remove something from his pocket, and give it to the go-between. The package, which was later determined to be amphetamines, was immediately given to the agents who paid for it, and the go-between then was seen handing the money to the defendant.

Here, the only independent proof introduced by the people to support the existence of the conspiracy, was the fact of the defendant's presence at the Stahl house on the night in question. The narcotics agents never talked directly with him; he was not seen talking with Stahl; his voice was not identified during the negotiation; no one saw him inside the Stahl house; he was not seen giving anything to Stahl, and, except for the two cigarettes, no narcotics were found. Mere presence does not amount to sufficient independent evidence to support the existence of the conspiracy to sell narcotics. *People v. Garcia,* 201 Cal.App.2d 589, 20 Cal.Rptr. 242 (1962).

*Glover v. United States,* 306 F.2d 594 (10th Cir. 1962) has some applicability here. In that case, although the defendant was seen ''in the vicinity'' where six drug transactions took place, and in the company of his alleged co-conspirator shortly after a government agent made a purchase, and shortly before deliveries were made, the court held that:

''While the evidence may have been sufficient to cast suspicion

upon Glover, that was not enough. Evidence which creates a mere suspicion of guilt is not enough. Guilt may not be inferred from mere association.''

■ The danger to be avoided, and the result in this case, is that hearsay is lifted ''by its own boot straps to the level of competent evidence.'' *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Further, the trial court never made a finding that there was sufficient independent evidence to warrant the consideration by the jury of the hearsay, nor was any warning given to the jury to disregard the statements if the jury could not find sufficient independent proof of the existence of the conspiracy. *See Beckwith v. United States,* 367 F.2d 458 (10th Cir. 1966). If followed, the procedure here would make the requirement of independent proof an empty one.

In light of our disposition of the conspiracy charge, we do not review the numerous other allegations of error as to that charge.

## II.

■ Defendant was charged with assault under C.R.S. 1963, 40-2-34 which reads in pertinent part:

''An assault with a deadly weapon,instrument or other thing, with an intent to commit upon the person of another a bodily injury where no considerable provocation appears or where the circumstances of the assault show an abandoned or malignant heart, shall be adjudged to be a felony . . . .''

Assault is defined under C.R.S. 1963, 40-2-33 to be an ''unlawful attempt coupled with a present ability to commit a violent injury on the person of another.''

■ The intent with which the act is committed is the gist of the offense. *Armijo v. People,* 157 Colo. 217, 402 P.2d 79 (1965). This court in *Shreeves v. People,* 126 Colo. 413, 249 P.2d 1020 (1952), quoted *People v. Hopper,* 69 Colo. 124, 169 P. 152, with approval, stating:

'' 'Where a crime consists of an act combined with a specific intent, the intent is just as much an element of the crime as is the act. In such cases, mere general malice or criminal intent is insufficient, and the requisite specific intent must be shown as a matter of fact, either by direct or circumstantial evidence. The rule is especially applicable where a statutory offense, consisting

of an act and a specific intent, constitutes substantially an attempt to commit some higher offense than that which accused succeeded in accomplishing. The general rule, * * * that a criminal intention will be presumed from the commission of the unlawful act does not apply; and proof of the commission of the act does not warrant the presumption that accused had the requisite specific intent. * * *' ''

Although it is settled that even specific intent may be inferred from the circumstances (*Johnson v. People*, 174 Colo. 413, 484 P.2d 110 (1971), it is argued that the circumstances in this case seem to negate such specific intent. We agree. The testimony of the officers, and of the defendant, showed that the car defendant was driving never left his lane of traffic; that there were two lanes traveling in the direction of the two cars; that there was adequate room in both lanes; and that although defendant could have made contact if he had wanted to, no contact was made.

The court in *Shreeves v. People, supra,* stated:

''The term 'abandoned and malignant heart' as the same is used in the statute here under consideration, is evidenced by the use of some instrumentality likely to produce great bodily harm, and by the brutal and unrestrained use of such instrumentality in the commission of the crime charged.''

In viewing the facts in the light most favorable to the prosecution, *People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973), we think that there was not sufficient evidence to establish criminal assault. *People v. Bennett, supra.*

Judgment reversed and cause remanded with directions to grant defendant's motion for acquittal as to both counts.

MR. CHIEF JUSTICE PRINGLE, MR. JUSTICE KELLEY and MR. JUSTICE LEE concur as to part I and dissent as to part II of this opinion.

MR. JUSTICE LEE concurring in part and dissenting in part.

I concur in Part I of the majority opinion but respectfully dissent to Part II.

The evidence presented by the People, together with the reasonable inferences therefrom, concerning the manner in which the defendant drove his vehicle during the ''cops and robbers''

chase, in my view, was sufficient to sustain the verdict of guilty of assault with a deadly weapon.

Viewing the chase in the context of the events of the evening, as described in the majority opinion, it becomes clear that the swerving of defendant's vehicle was not the innocent act of one who was lawfully operating his vehicle on the streets of Boulder and who unfortunately became the victim of a mechanical brake or steering malfunction, as the defendant suggested in his testimony. The swerving was not an isolated occurrence but happened, according to the police officers, three times during the high-speed chase which lasted for a period of approximately twenty minutes.

The jury could reasonably conclude under all the circumstances that the defendant three times deliberately swerved his car toward the surveillance car during the chase, thus forcing the surveillance car to take evasive action to avoid a collision and potentially grievous personal injuries; that the defendant's conduct in driving his car toward the police car was motivated by an abandoned and malignant heart, as evidenced by the unrestrained manner in which the car was being driven at that time; and that defendant's intention was to cause bodily injury upon the officers in the other car.

That the defendant's car did not cross the lane dividing the two driving lanes or make actual contact with the police car would not, in my view, lessen the criminal culpability demonstrated by the defendant in the operation of his car under the circumstances then existing.

I would affirm the judgment of conviction of assault with a deadly weapon.

I am authorized to say that MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE KELLEY join in this dissent.