**Antonio NUNEZ, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 85SC15.**

Supreme Court of Colorado,
En Banc.

May 26, 1987.

Karp & Dodge, Sander N. Karp, Shelley P. Dodge, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert M. Petrusak, Asst. Atty. Gen., Denver, for respondent.

ROVIRA, Justice.

We granted certiorari to consider the court of appeals decision in *People v. Nunez*, 698 P.2d 1376 (Colo.App.1984), which affirmed the conviction of the petitioner, Antonio Nunez, for the sale of a narcotic drug. Petitioner argues that the admission of certain statements made by a person who was not a witness, even if not forbidden by the rule against hearsay, nonetheless violated his right to be confronted by the witnesses against him under the United States and Colorado Constitutions. U.S. Const. amend. VI; Colo. Const. art. II, § 16. He also argues that his challenge for cause to one of the jurors was wrongly denied. We are not persuaded by either of his arguments and affirm his conviction.

I.

Midafternoon of January 26, 1981, Raul Batista, an undercover police officer, and Porfirio Roybal, a police informant, went to a bar in Denver to purchase heroin. Roybal was known in the bar as a heroin user and dealer. They were aware that Charles Lamorie, a drug dealer, frequented the bar. Testimony from Batista and Roybal at trial revealed the following events.

Once inside the bar, the two were approached by Lamorie. Batista told Lamorie he was interested in purchasing one-half ounce of heroin. Lamorie then told Batista that he would "call his connect and see what was going."[1] Roybal then accompa-

---

1. The phrase "call my connect" was used by Batista when testifying as to what Lamorie said. According to Roybal, Lamorie said he was going to call "his man." We use Batista's terminology as shorthand for the substance of both his and Roybal's testimony.

nied Lamorie to the public phone while Batista stayed at the table.

Roybal observed Lamorie placing a call and heard him talking about a drug deal. The person to whom Lamorie was talking apparently inquired who the buyer was, because Lamorie named Roybal, and then handed the phone to Roybal. Roybal asked Lamorie who was on the phone, and Lamorie said "Pic." "Pic" and "Piccolo" were aliases used by petitioner. Roybal had heard of "Piccolo," but had never met or spoken with him. A drug sale from "Piccolo" to Batista and Roybal was arranged.

"Piccolo" wished to sell drugs packaged differently, and more expensively, than Batista had originally intended to purchase. Batista and Roybal therefore left, obtained more money from another officer, and returned to the bar. Lamorie, who had remained at the bar, said it would take a "little longer." Approximately thirty minutes later, petitioner and two others entered the bar and sat down at a table with Batista, Roybal, and Lamorie. Lamorie introduced Batista and Roybal to "Piccolo." A brief conversation followed, in which the petitioner stated that the heroin was already cut and packaged to sell on the street. Roybal recognized petitioner's voice as the same one he had heard on the phone.

The petitioner said he would go get the drugs, and he and Lamorie left for a few moments, then returned and reseated themselves at the table. Roybal passed the $700 for the sale under the table to Lamorie, who was seated between petitioner and Roybal. Lamorie and the petitioner were observed doing something with their hands under the table. Then Lamorie indicated that Batista and Roybal should follow him to the men's room. There, Lamorie gave Batista 20 packets of heroin. Lamorie kept one packet, saying it was his fee for "setting up the connect."

Lamorie did not testify at trial. Throughout the testimony of Roybal and Batista, the petitioner repeatedly objected to the admission of Lamorie's statements on the grounds that they were hearsay. The trial court ruled that the statement, "I'm going to call my connect" was a statement of presently existing state of mind, and therefore admissible as an exception to the hearsay rule under CRE 803(3).[2] The trial court also found that a conspiracy between Lamorie and petitioner began at the time of the phone call, and so all subsequent statements were not hearsay under CRE 801(d)(2)(E).[3] The defendant was convicted of selling a narcotic in violation of section 12–22–302, 5 C.R.S. (1978).

The court of appeals affirmed. We granted certiorari to consider the defendant's contention that admission of Lamorie's statements violated his confrontation clause rights and to consider whether one of his challenges for cause to a juror was improperly denied.

## II.

In *People v. Dement,* 661 P.2d 675 (Colo. 1983), we considered the interaction between the "excited utterance" exception to the hearsay rule, CRE 803(2),[4] and the confrontation clause. We declined to establish a *per se* rule either allowing the hearsay exception to always satisfy the confrontation clause or to always require production of the declarant. Instead, we adopted the two-step case-by-case analysis formulated by the United States Supreme Court in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

**2.** Colorado Rule of Evidence 803(3) provides that a statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if it is a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)...."

**3.** Colorado Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

**4.** Colorado Rule of Evidence 803(2) provides that a statement is not excluded by the hearsay rule, even though the declarant is available as a witness if it "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the condition."

■ The first step is whether the People can demonstrate that the declarant is unavailable.

Unavailability "in the constitutional sense" is established by the prosecution when good faith, reasonable efforts have been made to produce the witness without success. However, the burden on the prosecution to produce the declarant for trial or to prove his unavailability applies only "in the usual case," and is subject to an exception when "the utility of trial confrontation [is very] remote."

*Dement*, 661 P.2d at 681 (citation omitted). We then elaborated on the "remote utility exception" by examining *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), where the prosecution was not required to produce an available witness when, among other factors, the hearsay evidence was not crucial or devastating, other evidence established that the hearsay declarant had personal knowledge of the fact asserted in the hearsay declaration, the statement was spontaneous and against the declarant's penal interest, and defense counsel cross-examined an eyewitness to the crime. *Dement* at 681.

The petitioner argues that the statement by Lamorie—"I'm going to call my connect"—was crucial because it established the conspiracy, which allowed other inculpatory statements to be admitted. We disagree. Even without Lamorie's initial statement, the evidence is sufficient for the court to infer a conspiracy.

Batista and Roybal testified that Lamorie was asked about purchasing some drugs. Roybal followed Lamorie to a phone, where Lamorie placed a call. Lamorie gave the receiver to Roybal, who negotiated a drug sale. A short time later, the petitioner, whose voice Roybal recognized as the same as the person whom he talked to on the phone, arrived. The previously negotiated drug sale was confirmed. Petitioner then said he would go get the drugs, and he and Lamorie left for a short time. They then returned, and Roybal passed money to Lamorie under the table, then the petitioner and Lamorie were seen doing something with their hands under the table. Lamorie then gave the drugs to Roybal and Batista. This evidence is more than sufficient to establish a *prima facie* conspiracy for the purposes of CRE 801(d)(2)(E). *See People v. Schlepp*, 184 Colo. 28, 518 P.2d 824 (1974) (conspiracy can be inferred where codefendant was seen talking to defendant, came to undercover police officers, stated the new price, officers gave him the purchase money, codefendant returned to defendant, defendant was seen reaching into his pocket, and codefendant then came back to police officers and had illegal drugs); *cf. People v. Braly*, 187 Colo. 324, 532 P.2d 325 (1975) (mere presence of the defendant at the location of the illegal transaction is not enough to establish conspiracy).

■ The introduction of Lamorie's initial statement, like the statement in *Dutton*, was neither crucial nor devastating, but merely incidental. The People were therefore not required to demonstrate the unavailability of Lamorie.[5]

The second step of the analysis adopted in *Dement* is whether the statement bears indicia of reliability sufficient to make it trustworthy without subjecting the declarant to cross-examination. In this case, all of the factors noted in *Dutton* are present. Lamorie's statement was spontaneous, against his penal interest, could be verified by an independent source, and eyewitnesses to the crime could be cross-examined at length. *Cf. Dement* (where three witnesses heard hearsay declarant state that defendant had struck the victim, but none of the witnesses had seen the blow, statement

---

5. The People correctly claim that the petitioner's objections to the testimony regarding Lamorie's statements were based exclusively on hearsay grounds, and that he never raised constitutional challenges until his motion for new trial. Therefore, the People argue, they never had an opportunity to demonstrate Lamorie's unavailability. The petitioner responds that constitutional objections are "implicit" in his hearsay objections. Because we determine that the People were not required to demonstrate Lamorie's unavailability in this case, we do not decide whether, if a showing of unavailability were required, a defendant's failure to expressly raise constitutional objections relieves the People of that duty.

could not be admitted even though it fell within the "excited utterance" exception to the hearsay rule, partially because there was no independent verification and no other eyewitnesses to the crime).

■ We conclude under these circumstances that the admission of the hearsay statement, "I'm going to call my connect," did not violate the petitioner's confrontational rights under either the United States or Colorado Constitutions.

## III.

■ Next, the petitioner argues that the subsequent statements of Lamorie admitted pursuant to the "coconspirator" exception also violated his right to confront witnesses against him. He argues that these statements cannot meet the two-step test in *Dement* because Lamorie's unavailability was never established.

Again, if cross-examination of Lamorie would have been of very remote utility, the People need not demonstrate his unavailability. Just as in *Dutton* and the "present state of mind" issue in this case, other evidence established that the hearsay declarant had personal knowledge of the facts asserted, the statements were spontaneous and against the declarant's penal interest, and defense counsel cross-examined an eyewitness to the crime.

Even absent any statements by Lamorie whatsoever, we are convinced that the circumstantial evidence of guilt is substantial and the statements were not crucial or devastating to the defense. Thus, under the facts of this case, the People's failure to establish Lamorie's unavailability did not

violate petitioner's confrontation clause rights.[6]

The second step in the *Dement* analysis is also satisfied because there are sufficient independent indicia of reliability to justify admission of the statements. There was substantial evidence from Batista and Roybal as to incriminating statements and actions by petitioner, including the voice identification by Roybal, the negotiation of the sale by petitioner, his statement that he would go get the drugs, and the subsequent production of the drugs. All the actions taken by petitioner were consistent with Lamorie's statements. Thus, on the facts of this case, we are persuaded that there are sufficient indicia of reliability to overcome defendant's confrontation clause arguments.

■ We reject the court of appeals adoption of a *per se* rule that whenever a statement falls within CRE 801(d)(2)(E) its admission cannot violate the defendant's confrontation rights. We refused to adopt a *per se* rule for all hearsay exceptions in *Dement*, and abide by that holding now. Although in this case there are sufficient indicia of reliability to render the statement trustworthy, that may not always be true.[7] A showing of reliability, beyond merely satisfying the requirements of CRE 801(d)(2)(E), is required.

We cannot predict all the circumstances that might arise, so we reaffirm that each case must be examined on its own facts, and the defendant's constitutional right to confront the witnesses against him should not be lightly set aside.

## IV.

■ Petitioner finally argues that the trial court erred when it did not grant his

---

6. In *United States v. Inadi,* 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Supreme Court held that unavailability of the coconspirator-declarant need not be shown for admission of a coconspirator's statement under the confrontation clause of the United States Constitution. *Inadi* was decided after this case had been briefed, so the parties did not argue for or against its adoption under the Colorado Constitution. Because we decide the evidence was admissible under the stricter *Dement* analysis, we need not decide if *Inadi* is applicable to Colorado confrontation clause analysis.

7. The coconspirator exception is particularly inappropriate for adoption of such a *per se* rule. As the commentary to the Federal Rules of Evidence states, the coconspirator exception is not based on inherent reliability of such statements, but rather on the fiction that coconspirators are agents of one another. Simply because the statements were made in furtherance of a conspiracy does not necessarily mean they are reliable enough to be admitted, through the mouth of someone other than the declarant, against a defendant in a criminal trial.

challenge for cause to juror Gesink. We thoroughly examined the issue of ungranted challenges for cause in *People v. Sandoval,* 733 P.2d 319 (Colo.1987). There, we stated:

> [I]f the court is satisfied that the potential juror will render a fair and impartial verdict according to the law and to the evidence submitted at trial, that person should not be disqualified.

> Trial courts are afforded broad discretion in deciding whether to grant or deny a challenge for cause to a potential juror, and a decision denying such a challenge will be set aside only when the record discloses a clear abuse of that discretion. This standard recognizes that the trial judge is the only judicial officer able to assess fully the attitudes and state of mind of a potential juror by personal observation of the significance of what linguistically may appear to be inconsistent or self-contradictory responses to difficult questions.

> An expression of concern by a potential juror regarding some facet of the case or about jury service should not result in the automatic exclusion of such person for cause. In some situations, the statements may simply reflect an honest effort to express feelings and convictions about matters of importance in an emotionally charged setting. It is the trial court's prerogative to give considerable weight to a potential juror's statement that he can fairly and impartially serve on the case.

*Sandoval* at 320–21 (citations omitted).

Applying this standard, we find no clear abuse of discretion. Although Gesink stated he "detested" criminals and drugs, and thought the defendant probably wouldn't be on trial if he hadn't done something wrong, he also stated that the defendant's guilt had to be proven, and that he could set aside his emotions and judge guilt entirely on the evidence presented at trial.[8]

8. The petitioner exercised a peremptory challenge on Gesink and ultimately exercised all his

The judgment of the court of appeals is affirmed.

peremptory challenges.