**Carlos A. HERRERA, Petitioner,**

v.

**Walter KELLY, Superintendent, Attica Correctional Facility, Robert Abrams, Attorney General of the State of New York, and Patrick Henry, District Attorney of Suffolk County, Respondents.**

No. CV–87–1314.

United States District Court, E.D. New York.

Aug. 31, 1987.

David W. Clayton, Clayton, Miller & Mayer, Hauppauge, N.Y., for petitioner.

Mark D. Cohen, Chief Law Asst. Chief, Appeals Bureau, Asst. Dist. Atty., Patrick Henry, Dist. Atty., of counsel, Riverhead, N.Y., for respondents.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### I. *Introduction*

Petitioner Carlos A. Herrera was convicted, after a jury trial in the New York State Supreme Court for Suffolk County, of criminal sale of a controlled substance in the first degree, N.Y. Penal Law § 220.43 (McKinney 1980), and conspiracy in the second degree, *id.* § 105.15 (McKinney Supp. 1987). The trial court sentenced Herrera to concurrent sentences of imprisonment: twenty-five years to life on the narcotics charge and eight and one-third to fifteen years on the conspiracy charge. Judgment of conviction was entered on July 13, 1984. On July 15, 1985, the appellate division affirmed the conviction. *People v. Herrara [sic],* 112 A.D.2d 315, 491 N.Y.S.2d 763 (2d Dep't 1985) (per curiam). Judge Meyer of the New York Court of Appeals denied leave to appeal on December 23, 1985. This petition for a writ of habeas corpus, 28 U.S.C. § 2254 (1982), followed.

The petition raises three points: (1) the Suffolk County District Court lacked jurisdiction to issue a search warrant with respect to an automobile located in Nassau County; execution of the warrant and seizure of evidence thereunder violated Herrera's rights under the fourth and fourteenth amendments; (2) Herrera's fourth amendment rights were violated again when he was arrested without a warrant as he slept in his motel room and the police seized a wrapped package of cocaine from an overnight bag; and (3) Herrera's rights under the sixth amendment's confrontation clause were violated when the trial court permitted undercover agents to testify about an out-of-court statement by alleged coconspirator Jack Bailey that Herrera was the "main guy" behind the drug sale.

### II. *Background*

Herrera was indicted with four other defendants: Jack D. Bailey, Rufus F. Faulk-

ner a/k/a Michael, Robert M. Leger, and Linda Spangle. The indictment arose from an investigation by the Suffolk County Police Department and the Drug Enforcement Administration of the United States Department of Justice into illicit sales of cocaine.

In the summer of 1983, Detective Joseph Avella of the Suffolk County Police and Michael Yaniello of the DEA commenced negotiations for the purchase of cocaine from their contacts, Faulkner and Spangle. The State's version of the facts is as follows. Bailey, an associate of Faulkner, had met Herrera in South Miami, Florida, at the home of a mutual friend, Daniel Peele. Herrera told Bailey he could provide a large quantity of cocaine. On September 27, 1983, Herrera called Peele from the Midway Hotel in New York City and asked him to come north to complete the drug deal that had been discussed in Florida. Peele called Leger to say that he had heard from Herrera and that they should go to New York immediately. On the next day, Spangle called Special Agent Yaniello to say that the deal was ready and that Faulkner would contact him the following day.

On September 29, at about 9:00 a.m., Faulkner called Special Agent Yaniello and said he would be arriving at Islip McArthur Airport later that evening. Faulkner told the agent that he represented individuals who had forty kilograms of cocaine, of which twenty were for sale, and that Special Agent Yaniello should make reservations for Faulkner at the Old Mill Inn, near the airport.

Later that day, a judge of the Suffolk County Court granted an application for a wiretap and authorized electronic surveillance of room 245 of the Old Mill Inn. Other undercover agents were situated in an adjoining room for surveillance purposes.

At approximately 8:05 p.m., Special Agent Yaniello and Detective Avella, still in their undercover capacity, met Faulkner at the airport and were introduced to Bailey. The four went to room 245 to discuss the sale of cocaine. In order to permit Bailey and Faulkner to go to New York City that night and discuss the logistics of the deal with their associates, it was agreed that Bailey and Faulkner would meet again with Yaniello and Avella at 9:00 o'clock on the morning of the next day, September 30.

Meanwhile, Leger and Peele, now located at the Metropole Hotel in Flushing, Queens, New York, contacted Herrera at his Queens location by use of a telephone beeper. He came to the Metropole with an associate called "Carlito." Herrera placed a kilogram of cocaine, wrapped in hard fiberglass tape, on the table, and he, Peele, and Leger snorted a small quantity. Herrera then directed that this kilogram should be "fronted" to the prospective buyers as a sample of the larger shipment.

When Herrera and Carlito left, Leger called Bailey and Faulkner at the Old Mill Inn and asked that they come to New York to firm up the details of the deal. Faulkner and Bailey arrived at the Metropole at approximately 11:30 p.m., and they participated in inconclusive discussions about whether it would be better to consummate the transaction on Long Island or in New York City.

At approximately 9:00 a.m. on September 30, Agent Yaniello called Faulkner at the Old Mill Inn and discussed the quantity and location of the proposed deal. They agreed that a face-to-face meeting would be appropriate, and Agent Yaniello and Detective Avella arrived at the hotel at about 10:00 a.m. There, they spoke for approximately fifteen minutes with Bailey and Faulkner, who repeated that the proposed deal was for fifteen kilograms but insisted that they were acting only as intermediaries for the "other side," who would require a meeting place in New York City.

Yaniello suggested that the parties agree on a middle ground on Long Island, and Bailey and Faulkner agreed to go back to their associates with this suggestion. When Agent Yaniello complained that the seller's agents had not shown good faith or any indication that they had cocaine to sell, Bailey and Faulkner produced a kilogram of cocaine as a demonstration of the quali-

ty of the merchandise involved. The discussion ended with Yaniello giving Faulkner $200 to pay for his and Bailey's cab ride to Queens.

After the undercover agents left the Old Mill Inn, Bailey called Leger at the Metropole Hotel to tell him about the problem concerning the site for the deal. Meanwhile, Yaniello and Avella went to the Suffolk County Police Department to obtain a laboratory analysis of the cocaine sample they had received from Bailey and Faulkner.

During the afternoon of September 30, Bailey and Faulkner went to the Metropole Hotel and spoke with Peele and Leger about the proposed meeting place for the transaction. After Herrera arrived at the Metropole, it was agreed that a compromise meeting place in one of the motels near exit 46 on the Long Island Expressway would be appropriate. Herrera said that "Queens is hot" for this type of transaction.

Herrera gave Bailey and Faulkner a yellow Chevrolet for use in travelling between Queens and Long Island. He also provided a second kilogram of cocaine for "fronting" to the prospective buyers and directed Bailey and Faulkner to collect the money due on the first kilogram previously provided. The group snorted several grams of cocaine from the second kilogram and Herrera left. Bailey and Faulkner also left, returning to the Old Mill Inn.

At around 3:54 p.m., Faulkner and Agent Yaniello discussed the compromise location for the deal. There followed a series of telephone calls, and it was agreed that Faulkner and Bailey would meet with Yaniello and Avella at the Holiday Inn in Plainview (Nassau County), near exit 46 of the Expressway. Peele and Leger arranged to relocate their operations to the Howard Johnson's Motel at exit 46. They arrived on Long Island at about 6:10 p.m.

Yaniello and Faulkner had further conversations about the logistical problems in consummating the transaction. Eventually, Faulkner said that the deal was taking longer than expected, and agreed to a face-to-face meeting. Yaniello and Avella arrived at the Holiday Inn at approximately 9:20 p.m. and, in their undercover automobile, met with Faulkner and Bailey. Bailey asked to see some money, and Yaniello and Avella displayed $150 in bills and seventy-five cents in coins. They told Bailey to advise his associates that he had been shown money.

Bailey left the undercover vehicle and returned in ten to fifteen minutes. He removed a package from a yellow Chevrolet parked in the Holiday Inn parking lot and re-entered the undercover car. At Bailey's request, the undercover agents drove to exit 49 in Huntington Station (Suffolk County). He handed a package to Avella, who was seated in the front of the car, and described the quality of the cocaine it contained. The agents returned Bailey and Faulkner to their hotel room at approximately 10:20 p.m. The group agreed that the deal would have to be put off until the following day, because of the supplier's late arrival.

That night, when Peele had heard from Bailey that Yaniello and Avella were eager to consummate the deal, he used the beeper to reach Herrera in his Queens apartment. Herrera said he could get about four kilograms of cocaine that night, but it would be better to wait until the next day, when he could obtain the entire amount for sale.

At around 10:00 p.m., Peele and Leger left the Holiday Inn at exit 46 and return to the Metropole Hotel in Queens. At around 1:00 a.m., they told Herrera that two kilograms had been fronted to Yaniello and Avella, but no money had been received in return. Herrera said this was peculiar, but concluded that this could be expected in light of the delays in finishing the deal. That night, Peele and Leger stayed at the Metropole.

At 11:00 a.m. on October 1, Avella called Faulkner at his Holiday Inn room and asked about the status of the cocaine. In this call and in four calls that afternoon, Avella or Yaniello spoke with Bailey or Faulkner about the "package" expected that afternoon.

During the afternoon, Peele and Leger checked out of the Metropole Hotel and went to the Howard Johnson's near the Holiday Inn at exit 46. Peele and Leger checked in to rooms 160 and 162 and called Herrera through the beeper. He called back and said that they should be patient; the deal was still on for sometime that day.

At approximately 4:30 p.m., Peele and Leger left the Howard Johnson's and took the yellow Chevrolet towards the Holiday Inn where Bailey and Faulkner were. They told Bailey and Faulkner that Herrera had said the supply would be arriving shortly. Peele said he was afraid he had seen some men surveilling their movements, but Leger attributed this sense to Peele's paranoia. Peele and Leger returned to the Holiday Inn at about 4:30 to 5:00 p.m.

At 6:00 p.m., Faulkner told Avella over the telephone that he was disgusted with the lack of progress on the deal and that the "habits" of several of his associates led them to suspect they were being followed. Faulkner said he was so displeased that he and Bailey intended to go to Kennedy Airport that evening and leave the transaction, but they would wait a while longer.

At around 6:30 p.m., Bailey called Yaniello to say that the people representing the source of supply had heard from the source that the cocaine shipment would arrive by 9:00 p.m. Herrera called Peele to say everyone should be patient; the deal was still on. At 9:00 p.m., Bailey told Yaniello by telephone that the package was expected shortly at the Howard Johnson's.

At approximately 9:20 p.m., undercover surveillance police saw a brown Oldsmobile bearing license plate 397–ZAH leaving the eastbound ramp for exit 46 of the Expressway. The Oldsmobile proceeded to the Howard Johnson's and pulled up next to the yellow Chevrolet. Peele left room 162 and came to speak to the driver, Herrera. Peele asked Herrera to slide over to the passenger seat and they drove for two or three miles. Peele said he was afraid the police were watching the group. They concluded not to go forward with the deal, but

Leger persuaded them to go forward when they return to room 162 at the Holiday Inn.

At 9:30 p.m., Avella called Bailey, who said that the package had arrived and that Avella and Yaniello should go to a room in the Holiday Inn where the transaction could be negotiated and completed. Avella said it was too dangerous for him to walk into a room with hundreds of thousands of dollars, and Bailey agreed to a face-to-face meeting. At 10:20, Avella and Yaniello arrived at the Holiday Inn in an undercover Lincoln automobile, to pick up Bailey and Faulkner.

They proceeded to a location near rooms 160 and 162 at the Howard Johnson's, where Bailey left the car and entered room 160. Approximately ten minutes earlier, Peele had left room 160, retrieved a brown wrapped package appearing to hold a weapon from the trunk of the Oldsmobile, and returned. While Bailey was out, Herrera left rooms 160 and 162 and walked to the end of the building, where, apparently, he looked into Avella and Yaniello's Lincoln.

Bailey returned from room 160 and told Avella and Yaniello to get their money together for a showing. They said that the Hispanic man who had left the room and returned was "Carlos," the "main guy." Bailey also said Herrera was "the guy we have been waiting for."

There were discussions about whether a pharmacist could come to test the product. Avella and Yaniello refused to consummate the transaction at either the Holiday Inn or the Howard Johnson's. They returned Bailey and Faulkner to their room at the Holiday Inn to expedite the showing of the money.

At 11:50 p.m., Yaniello spoke with Bailey and Faulkner. Bailey said his "friend" would have to "meet Mr. Green" in order to expedite the deal, so that he would be "comfortable" so he could "release that item." In an undercover Cadillac, DEA Special Agent "Arty" Scalzo and Suffolk County Detective Angelo Carrion went to the designated site at the Pickwick Motor Lodge just east of the Howard Johnson's and Holiday Inn.

Avella and Yaniello picked up Bailey and Faulkner at the Holiday Inn and went to the Howard Johnson's, where Bailey left the car and returned with Leger. Yaniello, Avella, Faulkner, Bailey, and Leger then drove to the Pickwick. There, Leger left the Lincoln and entered the Cadillac, where he was shown $400,000 cash. He looked through the money and returned to the Lincoln, adding that "Carlos will count the money."

Leger returned and said he was satisfied with the money he had seen. He added that Herrera still had one kilogram of the shipment, but the rest was in the trunk of a car "the Colombian" had delivered.

Leger expressed his concern that the transaction was being watched. At his request, Avella and Yaniello drove to exit 46 to "check out" a vehicle on the exit ramp. They saw an apparently empty automobile, which, in fact, was an undercover Suffolk County Police Department car with two surveillance detectives inside. Leger was told that it might be a private investigator's car, there for observation of illicit transactions at the Howard Johnson's, and Leger appeared pacified. The agents returned Leger to the Howard Johnson's and, shortly thereafter, at 12:45 a.m. on October 2, dropped Bailey and Faulkner off at the Holiday Inn. Leger told Herrera he had seen the money. Herrera said it was too late to continue negotiations and that the transaction should be postponed to the following morning. At 1:55 a.m., Bailey and Yaniello discussed the remaining logistical problems and Bailey decided, over Yaniello's objection, to put matters over to the morning.

At about that time, officers in surveillance units saw Bailey entering his hotel room with what appeared to be a three-foot long package in the shape of a rifle. Law enforcement officers, concerned about the apparent presence of weapons and the delays in the deal, decided to arrest Faulkner and seek his cooperation.

At 2:45 a.m., Avella called Faulkner in his room and asked for a meeting outside the Holiday Inn entrance way to clear up potential last minute problems. When Faulkner entered the Lincoln, he was arrested and removed without difficulty. When Faulkner refused to cooperate, officers arrested Bailey next to his Holiday Inn room.

At about 5:00 a.m., officers used pass keys they obtained from Howard Johnson's and arrested Leger in room 160 and Peele in room 162. After Peele received his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he agreed to cooperate and told the police that Herrera was in another room at the Howard Johnson's, which Peele could remember only as "330–something." Peele added that Herrera had one kilogram of cocaine in his room and that the rest was in the Oldsmobile in the parking lot. The police then determined which room Herrera was in and entered it with a pass key. There, they arrested Herrera. The police determined that it was impractical to obtain an arrest warrant because there was a high likelihood of a shootout, a chase, or a hostage situation, and because they feared the destruction of evidence. When the police entered Herrera's room, number 336, they saw an open bag containing what appeared to be a kilogram of cocaine. They found no weapons.

Meanwhile, the police kept the Oldsmobile under surveillance and applied for a search warrant. A Suffolk County District Court judge signed a warrant at approximately 9:30 a.m. on October 2. The police used a "slim jim" to open the car and found a beer can, a car rental form, and Herrera's wallet (which contained the rental agreement and a pay stub for Maria Velez, who introduced Herrera to Peele). The police then popped open the trunk and found three cardboard boxes containing twenty-one individually wrapped kilograms of cocaine. It was later determined that these kilograms, together with the two given the undercover officers and the one found in Herrera's room, were more than 90% pure. It was also determined that Herrera's palm print was on one of the cardboard boxes in the Oldsmobile's trunk and his thumb print was on the beer can inside the car.

At trial, the State and Herrera stipulated that telephone records showed a series of telephone calls at or about the time of the foregoing events between Herrera's residence in Jamaica, Queens and the Howard Johnson's and Holiday Inn. Also, there was a call to the Holiday Inn from a Hicksville pay telephone, and that call was billed back to Herrera's home number. Finally, the parties stipulated that the Pickwick Motor Inn, at its westernmost edge, was 590 feet from the border of Suffolk and Nassau Counties.

Herrera called four witnesses at trial. DEA Special Agent Tom Creegan testified regarding the surveillance on the Holiday Inn on October 1 and 2, 1983. He said that an individual was seen carrying a three-foot object into room 126 of the Holiday Inn, but he was not sure it was Leger. Also, he confirmed that no weapons were found in the searches of Peele's and Leger's rooms.

The front desk manager of the Holiday Inn, James McNally, testified about the motel's procedures for billing telephone calls. He told the court about a seven-minute telephone call from room 160 or 162 to the telephone number (305) 233–8878 made at 11:47 p.m. on October 1, 1983.

Herrera's wife, Maria Helena Herrera, testified that she lived in Miami, Florida and Jamaica, Queens with her husband. She added that she received the October 1 call about which McNally had testified and that Herrera had stated at that time that he would return to Florida shortly. She also testified that Herrera sounded drunk during that conversation.

Herrera's last witness was Cornelius McGrath, who testified that he was associated with Herrera in a business called Sir America Services, which exported medical equipment to Colombia. McGrath said his wife was the aunt of Herrera's wife, and added that Herrera had a reputation for honesty and being a law-abiding citizen. McGrath stated, in addition, that his opinion of Herrera would change if it were proven that he had been involved in a cocaine deal.

As Herrera summarizes the facts, Avella and Yaniello initially contacted Spangle and Faulkner to set up a cocaine sale in New York, but the latter two were reluctant because they dealt primarily in marijuana. Eventually, Bailey, an associate of Faulkner, met with Peele in Florida to set up a cocaine delivery in New York. Herrera contends that Peele named him as his cocaine connection to divert blame from himself.

Herrera emphasizes that negotiations began at 8:00 p.m. on September 29 but he did not arrive at the Howard Johnson's until 9:20 p.m. on October 1. He also underscores the fact that Peele took over driving of the car at that point and that police were so mystified by his presence that they had to ask Bailey who Herrera was. Herrera maintains that he did nothing more, after arriving at the Howard Johnson's, than have a few drinks and go to bed.

Herrera emphasizes that all the arrests on the morning of October 2 were accomplished without violence and without weapons being found. As to his arrest, Herrera says that the overnight bag found in his room, in which one kilogram of cocaine rested, belonged to Peele. Herrera told the arresting officers that he had met Peele and Leger in New York City and that they had offered him $100 to drive a rental car out to the motel, which he did. In his version, Herrera delivered the car to Peele, got drunk, and went to bed, knowing nothing of any cocaine transaction. Thus, according to Herrera, it was not probative that his wallet and other personal effects were found in the Oldsmobile that contained twenty-one kilograms of cocaine.

Against this background, the court considers Herrera's three constitutional challenges to the validity of his state court conviction.

### III. *The Search Warrant*

Herrera contends that the Suffolk County District Court lacked jurisdiction, as a matter of state law, to issue a search warrant for execution in another county: in this case, Nassau County, where the Pickwick Motor Lodge is located. Of course,

this contention, even if correct, is insufficient, on its own, to compel issuance of the writ, because Herrera "can obtain federal habeas corpus relief only if his custody is in violation of the Federal Constitution," *Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). Herrera argues, however, that the procedure followed by the state court violates the fourth amendment's warrant requirement and the due process and equal protection clauses of the fourteenth amendment.

With respect to his fourth amendment claim, Herrera is aware that the Supreme Court has "conclude[d] that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial," *Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). To avoid running into the brick wall of *Stone v. Powell,* Herrera characterizes his claim as a "mixed" fourth and fourteenth amendment issue and cites *Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), for the proposition that this court is permitted to reach the merits of the petition.

In *Kimmelman,* the State attempted to analogize the sixth amendment right to counsel to the fourth amendment rights discussed in *Stone.* Although three justices concurred only in the result, the Court was unanimous that *Stone* was not controlling in the sixth amendment context. *Id.* at 2584 (unlike habeas petitioner in *Stone,* Morrison seeks direct federal habeas protection of his personal right to effective assistance of counsel, which is beyond question a fundamental right); *id.* at 2591–92 (Powell, J., joined by Burger, C.J. and Rehnquist, J., concurring in the judgment) (*Stone* does not bar consideration of ineffective assistance claim on federal habeas corpus). Thus, the *Kimmelman* Court refused to apply *Stone* "to a Sixth Amendment claim which is based principally on defense counsel's failure to litigate a Fourth Amendment claim competently." *Id.* at 2583.

*Kimmelman* distinguished *Stone* on the ground that the fourth amendment does not confer a trial right, while the sixth amendment does. *See id.* at 2582–83. By contrast, Herrera's reliance is squarely on the non-trial rights of the fourth amendment. He cites one post-*Stone* case in which the court reached the merits of a claim sounding in the fourth amendment, but, in *Yanez v. Romero,* 619 F.2d 851, 853–54 (10th Cir.), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980), the question was whether a urine sample had been obtained in violation of the *fifth amendment* due process principles of *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Here, Herrera's due process/equal protection argument is that he was denied a neutral and detached magistrate when the warrant was issued and that violation of established state procedure constituted a denial of fundamentally fair treatment. This is tantamount to saying that the fourth amendment violation in this case was so egregious as to rise to the level of a due process or equal protection violation. Assuming *arguendo* that the fourth amendment was violated, the violation was not nearly so egregious as to violate due process or equal protection. Herrera had an opportunity to press his fourth amendment and state procedural arguments in state court. The state courts rejected those arguments, and he disagrees with their conclusion. But even strong disagreement with a state court's reading of the fourth amendment will not suffice to circumvent *Stone.* The gist of the matter is that Herrera's fourth amendment claim is just that: a fourth amendment claim. Attempts to find other names for that claim will not make it any more cognizable in the context of a federal habeas petition. Accordingly, the court holds that *Stone v. Powell* bars consideration of the merits of the fourth amendment claim, and it is therefore unnecessary for the court to reach the alternative fourth amendment arguments (good faith, "impound and discovery," and inevitable discovery) advanced by the State.

## IV. *The Warrantless Arrest*

Herrera attacks his warrantless arrest on the theory that the police had ample time to obtain a warrant and that there were no "exigent circumstances" justifying entry into his room without one. As with Herrera's claim that the search warrant for the Oldsmobile was obtained improperly, there is a *Stone v. Powell* obstacle blocking review of the merits in this collateral proceeding.

According to Herrera, *Stone* does not impede the court from reviewing this contention, because there was an unconscionable breakdown of state court process and no reasoned method of inquiry into the existence of exigent circumstances. Toward this end, Herrera relies upon *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir.1977) (en banc), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978), where the court held:

> If the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available. It may further be that even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted. [Citations omitted.]

Clearly, this is not a case where the State provides "no corrective procedures" for fourth amendment violations. Before Herrera went to trial, there was a suppression hearing at which he advanced his fourth amendment arguments, and those arguments were reiterated to the appellate division and to the court of appeals. Herrera's argument, instead, is that "[t]he state failed to apply a rational, objective and knowable standard in ruling on the question of exigency, and instead relied on the wholly subjective and factually unsupported whim of the judge." Reply Memorandum of Law at 22.

At the conclusion of the suppression hearing, the court ruled as follows:

> The Court rules with respect to the findings of the Court that since the evidence of the police is completely uncontradicted by any testimony and there is no inconsistency shown to the Court's recollection of substantial matter, that the arrest was warranted and indicated without a warrant. The sale was obviously in danger of being terminated because of the mutual cautions of both sides. They were dealing with a large amount of cocaine. They were in possession of some $80.000.00 [sic] worth of good payment—security isn't the word. Apparently in the terminology of the street, the recipiants [sic] of the good faith deposit, could have just left with it, which would certainly indicate to anybody of reasonable experience in the drug business that there must have been a lot more to make it worth while to, "front," that amount of cocaine. It would be very easy for the defendant, the defendant, Herrera, to leave with or without the cocaine. That if, in fact, the other two had been arrested, there had been some prearranged conference of telephone call and if the defendant had made such a call, would have certainly a justifiable conclusion [sic] on his part that perhaps things weren't going so well and he better leave for his health.

> In addition, the cocaine could have been very easily disposed of by flushing it down into the toilet. It's a powder. It could have been broken up and the evidence destroyed.

> The Court rules that due to the exigent circumstances the arrest without the warrant was justified. The seizure of the cocaine found there to be justified either as a search incident to the arrest or contraband in open view of the policeman [sic] who as experienced officers and due to the rather unique but typical method of packaging, elliptical object, usually analogous to that of a football, could reasonably expected [sic] that it was cocaine.

Tr. 544–46.

Even if there had never been a *Stone v. Powell*, the factfinding of the trial judge would be entitled to a presumption of correctness, assuming the requirements of 28 U.S.C. § 2254(d) were met. In light of

*Stone,* the presumption is even stronger, because the question posed by *Gates v. Henderson* is whether Herrera was precluded from utilizing state procedures to redress fourth amendment violations "by reason of an unconscionable breakdown in that process."

Under *Stone* and *Gates,* "[w]hen the state provides a facially adequate procedure, a petitioner cannot gain review of a Fourth Amendment claim simply by arguing that the federal court would have reached a different result." *Shaw v. Scully,* 654 F.Supp. 859, 863 (S.D.N.Y.1987). *Shaw* found a clue to the meaning of "unconscionable breakdown" in *Gates*'s citation to *Frank v. Mangum,* 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915). 654 F.Supp. at 864 (discussing *Gates,* 568 F.2d at 840). In *Frank,* the Supreme Court affirmed denial of the writ where the petitioner contended, in a now notorious case, that his murder trial was dominated by an angry mob. The Court reasoned that due process would have been violated if the mob intimidated the jury and the trial judge had yielded, but only if the state supplied "no corrective process." 237 U.S. at 335, 35 S.Ct. at 590. But the Court found that Georgia provided adequate procedures to remedy such due process violations and therefore concluded that due process had not been denied. *Id.* at 335–38, 35 S.Ct. at 590–91.

Whether the result in *Frank* would be the same today is beside the point. The relevance of *Frank* is that *Gates* cited the case as an example of the type of disruption that constitutes an "unconscionable breakdown." The other example cited by *Gates,* 568 F.2d at 840, is Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L. Rev. 441, 456–57 (1963). On the cited pages, Professor Bator noted that state courts are obligated to follow constitutional norms and that their decisions are subject to Supreme Court review. He thus asked: "What further role is left for a federal collateral jurisdiction such as habeas corpus?" *Id.* at 456. His answer was that one circumstance justifying habeas review would be "where the state has, in effect, failed to provide process." *Id.* According

to Professor Bator, this could take place "if a state fails to give the defendant any opportunity at all to test federal defenses relevant to his case," *id.,* or if the process provided was meaningless because "the totality of state procedures allegedly did not provide rational conditions for inquiry into federal-law (or, indeed, state-law) questions," *id.* at 457. Professor Bator offered four examples of meaningless process: if the trial judge was bribed, or a mob dominated the trial, or the defendant was tortured to plead guilty, or the prosecution knowingly used perjured testimony—and, in addition, "the state provided no fair process, direct or collateral, for the testing of these allegations." *Id.*

An examination of *Frank* and the Bator article demonstrates that Herrera has failed to show an "unconscionable breakdown" within the meaning of *Gates.* In essence, Herrera contends that the trial judge (and the state courts that affirmed the judgment of conviction) believed unbelievable testimony in finding exigent circumstances to justify the warrantless arrest. *Gates* gives this court no license to second-guess the state courts' factual determinations. Even though "exigent circumstances" is a mixed question of fact and law, habeas review remains unavailable, because Herrera had an opportunity to present both his factual and legal arguments to the state courts and, in the context of a fourth amendment claim, *Stone v. Powell* requires no more. The testimony at the suppression hearing and the trial court's ensuing findings simply do not give rise to an "unconscionable breakdown" claim. Accordingly, this court may not consider the merits of Herrera's second fourth amendment claim, either.

## V. *Confrontation*

■ Herrera's final claim is that the sixth amendment's confrontation clause was violated when Agent Yaniello and Detective Avella were permitted to testify that Jack Bailey said Herrera was the "main guy" or "the guy we have been waiting for." According to Herrera, "[t]he testimony was hearsay within hearsay and, more importantly, was idle conversation

not in furtherance of the conspiracy to sell cocaine." Reply Memorandum of Law at 24.

Some of the reasons that the confrontation clause is applied less strictly to coconspirator statements than, for instance, to former testimony, were recited in *United States v. Inadi*, 475 U.S. 387, ——, 106 S.Ct. 1121, 1126-27, 89 L.Ed.2d 390 (1986):

> Because they are made while the conspiracy is in progress, such [coconspirator] statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. When the Government—as here—offers the statement of one drug dealer to another in furtherance of an illegal conspiracy, the statement often will derive its significance from the circumstances in which it was made. Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand. Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy.
>
> In addition, the relative positions of the parties will have changed substantially between the time of the statements and the trial. The declarant and the defendant will have changed from partners in an illegal conspiracy to suspects or defendants in a criminal trial, each with information potentially damaging to the other. The declarant himself may be facing indictment or trial, in which case he has little incentive to aid the prosecution, and yet will be equally wary of coming to the aid of his former partners in crime. In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force.

More recently, the Court has held "that the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that, under this Court's holding in [*Ohio v.*] *Roberts*, [448 U.S. 56, 100 S.Ct.

2531, 65 L.Ed.2d 597 (1980),] a court need not independently inquire into the reliability of such statements." *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987).

In light of the foregoing, Herrera's sixth amendment argument misses the mark. He says that Bailey's statements were not made from personal knowledge, but rather were based in turn upon out-of-court statements by Robert Leger. He also contends that the statements were not made in furtherance of the conspiracy. But the trial court was entitled to find, in the totality of the circumstances, that a preponderance of the evidence showed the existence of a conspiracy, the participation of Herrera, Bailey, and Leger in that conspiracy, and that the statements in question were made in furtherance of the conspiracy. *See id.* at 2778-79 (preponderance standard). The court will not rehearse the extensive evidence showing the existence of a conspiracy and the participation of these three individuals in it, some of which has been discussed in Part II, *supra*. And it almost goes without saying that statements that Herrera was the "main guy" or "the guy we have been waiting for," made in the context of sensitive, not to say tortuous, negotiations over a drug deal, could be found to have been made in furtherance of a conspiracy. Finally, Herrera does not contest that the statements were made in the course of the conspiracy.

For the foregoing reasons, the court determines that admission of the coconspirator statements in question was permissible under the confrontation clause. To the extent that Herrera believes the statements unworthy of belief, the proper place for his argument was in summation to the jury. He has failed, however, to identify a constitutional defect in their admission.

## VI. *Conclusion*

Because the court has found that each of Herrera's claims lacks merit, his petition for a writ of habeas corpus is dismissed. Inasmuch as the court believes that Herrera has advanced colorable arguments that merit appellate review, this sentence shall constitute a certificate of probable cause

**974**

within the meaning of Federal Rule of Appellate Procedure 22(b).

SO ORDERED.